## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Brady O'Donnell, being duly sworn, depose and state that:

## INTRODUCTION

1.      I have been employed by the Drug Enforcement Administration ("DEA") since August of 2020.  I am currently assigned to the New England Field Division, Task Force 5 as a Special Agent, where I am tasked to investigate drug trafficking and money laundering organizations, and their ties to violent crime.  I graduated from the DEA Basic Agent Training Academy in Quantico, Virginia in December of 2020, where I received specialized training in narcotics and money laundering investigations and related legal matters.  Prior to my employment as a Special Agent, I was employed as a regional development officer for DeliverFund, which is a private counter-human trafficking intelligence company.  DeliverFund is based in Dallas, Texas and focuses on training state and local law enforcement in specialized counter-human trafficking investigative techniques.  Before that, I completed a graduate degree in Public Affairs from Brown University in Providence, Rhode Island, where I focused on policy related to national security, public safety, and transnational criminal investigative models.

2.      During my specialized training at the DEA Training Academy, I participated in numerous exercises to include the use of confidential informants, undercover operations, physical and electronic surveillance, telephone toll analysis, investigative interviews, and the execution of search and seizure warrants. In addition, I was further trained in specialized defensive tactics, firearms training, raid and entry tactics, judgmental shooting, and legal training.

3.      I have participated in many aspects of drug and money laundering investigations, including physical surveillance, surveillance of undercover transactions, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking and money laundering organizations.  I

am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods and means of moving payments for such drugs. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

## PURPOSE OF AFFIDAVIT

4.      I submit this affidavit in support of a criminal complaint alleging that between at least January 2021 and the date of this affidavit, (1) Chengzou LIU a/k/a "Sam" ("LIU"); (2) Qiu Mei ZENG ("ZENG"); (3) Shi Rong ZHANG ("ZHANG"); (4) Vincent FENG ("FENG"); (5) DA Zeng ("DA"); (6) WEI QING Zeng ("WEI QING"); (7) XIAN RONG Zeng ("XIAN RONG"); (8) QIU FANG Zeng ("QIU FANG"); and others (collectively, the "Target Subjects"), engaged in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and conducted an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960 (collectively, the "Target Offenses").

5.      Based on the facts in this affidavit, there is probable cause to believe that the Target Subjects have committed the Target Offenses.

6.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, confidential sources, court ordered interception of wire communications, and my personal review of records and reports relating to the investigation.

7.      Since this Affidavit is being submitted for the limited purpose of securing the requested criminal complaint, I have not included each and every fact known to me concerning

this investigation. I have set forth only the facts that I believe are necessary to that there is probable cause for the requested complaint.

## PROBABLE CAUSE

8. Since approximately January 2021, investigators with DEA have been conducting an ongoing investigation into the Target Subjects, who are believed to be involved in laundering large quantities of U.S. currency, including drug proceeds and proceeds from stolen gift cards, and conducting an unlicensed money transmitting business. Based on the investigation to date, investigators believe the Target Subjects are involved in numerous illegal schemes to transmit and launder tens of millions of dollars in illicit proceeds.

9. On June 22, 2022, the Honorable Judith G. Dein, United States Magistrate Judge, District of Massachusetts authorized search warrants related to residences and/or business locations related to the Target Subjects. 22-5182-5186-JDG. The affidavit in support of those warrants (the "June 22, 2022 Affidavit") is attached hereto and incorporated fully herein.

10. Based on the facts set forth in detail in the June 22, 2022 Affidavit, there is probable cause to believe that between at least January 2021 and June 23, 2022, the Target Subjects engaged in a money laundering conspiracy, in violation of 18 U.S.C. § 1956, and conducted an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.

Brady O'Donnell
Special Agent
Drug Enforcement Administration

Sworn via telephone in according with Fed. R. Crim. P 4.1 on this 27th day of June, 2022.

JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

3

I, Special Agent Brady O'Donnell, being duly sworn, depose and state that:

## INTRODUCTION

1.      I have been employed by the Drug Enforcement Administration ("DEA") since August of 2020.  I am currently assigned to the New England Field Division, Task Force 5 as a Special Agent, where I am tasked to investigate drug trafficking and money laundering organizations, and their ties to violent crime.  I graduated from the DEA Basic Agent Training Academy in Quantico, Virginia in December of 2020, where I received specialized training in narcotics and money laundering investigations and related legal matters.  Prior to my employment as a Special Agent, I was employed as a regional development officer for DeliverFund, which is a private counter-human trafficking intelligence company.  DeliverFund is based in Dallas, Texas and focuses on training state and local law enforcement in specialized counter-human trafficking investigative techniques.  Before that, I completed a graduate degree in Public Affairs from Brown University in Providence, Rhode Island, where I focused on policy related to national security, public safety, and transnational criminal investigative models.

2.      During my specialized training at the DEA Training Academy, I participated in numerous exercises to include the use of confidential informants, undercover operations, physical and electronic surveillance, telephone toll analysis, investigative interviews, and the execution of search and seizure warrants. In addition, I was further trained in specialized defensive tactics, firearms training, raid and entry tactics, judgmental shooting, and legal training.

3.      I have participated in many aspects of drug and money laundering investigations, including physical surveillance, surveillance of undercover transactions, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had

personal knowledge regarding major narcotics trafficking and money laundering organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods and means of moving payments for such drugs. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

4. Based on my training and experience, I am also aware that money launderers and/or money transmitters commonly use cellular telephones to communicate about and further their money laundering and money transmitting activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that money launderers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

5. This Affidavit is being submitted in connection with an ongoing investigation involving: (1) Chengzou LIU a/k/a "Sam" ("LIU"); (2) Qiu Mei ZENG ("ZENG"); (3) Shi Rong ZHANG ("ZHANG"); (4) Vincent FENG ("FENG"); (5) DA Zeng ("DA"); (6) WEI QING Zeng ("WEI QING"); (7) XIAN RONG Zeng ("XIAN RONG"); (8) QIU FANG Zeng ("QIU FANG");

and others (collectively, the "Target Subjects").

6. I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, confidential sources, court ordered interception of wire and electronic communications, and my personal review of records and reports relating to the investigation.

7. Based on my training and experience, and for all the reasons set forth herein, probable cause exists to believe that the Target Subjects are engaged in criminal activity including: (a) money laundering and/or money laundering conspiracy, in violation of 18 U.S.C. § 1956 and/or 1957; and (b) conducting unlicensed money transmitting business, in violation of 18 U.S.C. § 1960; (collectively, the "Target Offenses"). As detailed below, there is also probable cause to believe that the Target Subjects maintain and use residences and/or businesses in furtherance of the Target Offenses, including to store and/or transfer evidence, fruits, and instrumentalities of the Target Offenses.

8. I submit this affidavit in support of applications for search warrants for the following locations (the "Target Locations") and the cellular telephones and computer equipment located therein:

      a. **Target Location 1: 23 Tyler Street, Floor 2, Boston, Massachusetts**. Target Location 1 is further described in Attachment A1 and herein: the building at 23 Tyler Street is a multi-colored brick, multi-floor mixed use building in a busy section of Boston's Chinatown located next to a parking lot. The location to be searched is Floor 2, an office space immediately above the China Gourmet Restaurant, which is located at 23 Tyler Street, Floor 1. The door to Target Location 1 is a frosted glass door with a door handle that is passcode controlled. Photographs of Target Location 1 can be found in Attachment A1. Target Location 1 is accessed via an external set of stairs which leads to a landing with an entrance door to the China Gourmet Restaurant on the left, and a glass door straight ahead. After proceeding through this glass door straight ahead, and through a second glass door, Target Location 1 is accessed via a second set of internal stairs, which leads to a landing. The frosted glass entrance door to Target Location 1 has a red-colored door frame and is the only door on this second floor landing. The area to be searched

is the entire second floor accessible via this frosted glass door. As detailed below, Target Location 1 is believed to be an office space used by ZHANG, ZENG, QIU FANG, WEI QING, and XIAN RONG to facilitate their money laundering and unlicensed money transmitting business.

b. **Target Location 2: 117 Standish Avenue, Unit 2, Quincy, Massachusetts**. Target Location 2 is further described in Attachment A2 and herein: the residence at 117 Standish Avenue is a grey-colored, vinyl-sided, multi-unit house with a small driveway to the left of the residence that leads to a parking area in the rear. There are multiple entrances to the building, however, FENG enters the residence via a side door with a small number of steps in front of it. FENG owns the entire residence, but the location to be searched is Unit 2, which can be accessed through this side door. A photograph of Target Location 2 can be found in Attachment A2. As detailed below, Target Location 2 is believed to be FENG's residence.

c. **Target Location 3: 24 Merrymount Avenue, Quincy, Massachusetts**. Target Location 3 is further described in Attachment A3 and herein: the building at 24 Merrymount Ave is a single family residence with white vinyl siding. There are multiple entrances to the building, however, the main entrance to the residence is in the front of the building, at the top of a small set of stairs. The location to be searched is the entire residence. A photograph of Target Location 3 can be found in Attachment A3. As detailed below, Target Location 3 is believed to be WEI QING's residence.

d. **Target Location 4: 34 Sewall Street, Quincy, Massachusetts**. Target Location 4 is further described in Attachment A4 and herein: the building at 34 Sewall Street is a yellow residence with a detached garage in the rear. The entire residence is historically owned by ZENG, ZHANG, and their family. The location to be searched is the entire residence. A photograph of Target Location 4 can be found in Attachment A4. As detailed below, Target Location 4 is believed to be QIU FANG's residence.

e. **Target Location 5: 147 Summer Street, Hanover, Massachusetts**. Target Location 5 is further described in Attachment A5 and herein: the building at 147 Summer Street is a beige single-family residence, with a long driveway that leads to a two-car garage on the right side of the residence. The location to be searched is the entire residence. Target Location 5 can be accessed via the front door. A photograph of Target Location 5 can be found in Attachment A5. As detailed below, Target Location 5 is believed to be XIAN RONG's residence.

9.      As detailed below, there is probable cause to believe that evidence, fruits, and

instrumentalities of the Target Offenses (as described in Attachments B1-B5) will be located inside

each of the Target Locations (as described below and in Attachments A1-A5), and on the cellular telephones and computer equipment located therein.

10.     Since this Affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for such warrants.

## PROBABLE CAUSE

### Procedural History

11.     On September 30, 2021, the Honorable F. Dennis Saylor, Chief United States District Judge, District of Massachusetts, signed an Order (hereinafter the "September 30 Order") authorizing the initial interception of wire and electronic communications to and from LIU's telephone number 646-338-2235 ("Target Telephone 1" or "TT1"). The September 30 Order authorized interceptions for an initial thirty-day period, or until the attainment of the authorized objectives of the investigation, whichever was earlier. The monitoring of communications over TT1 pursuant to the September 30 Order began on October 1, 2021, and terminated on October 30, 2021.

12.     On November 17, 2021, Judge Saylor signed an Order (hereinafter the "November 17 Order") authorizing the initial interception of wire communications to and from two telephones used by ZENG, 857-452-2829 ("Target Telephone 2" or "TT2") and 857-250-5197 ("Target Telephone 3" or "TT3"). The November 17 Order authorized interceptions for an initial thirty-day period, or until the attainment of the authorized objectives of the investigation, whichever was earlier. The monitoring of communications over TT2 and TT3 pursuant to the November 17 Order began on November 18, 2021, and terminated on or about December 17, 2021.

13.     On February 9, 2022, Judge Saylor signed an Order (hereinafter the "February 9 Order") authorizing the renewed interception of wire communications to and from Target Telephones 2 and 3, as well the initial interception of wire communications to and from a telephone used by ZHANG, 781-267-4098 ("Target Telephone 4" or "TT4"). The February 9 Order authorized interceptions for an initial thirty-day period, or until the attainment of the authorized objectives of the investigation, whichever was earlier. The monitoring of communications over TT2-TT4 pursuant to the February 9 Order began on or about February 10, 2022, and terminated on or about March 10, 2022.

14.     The Honorable M. Page Kelley, Chief United States Magistrate Judge, has authorized a number of warrants in this investigation to date, including a number of residential search warrants related to LIU and his marijuana-trafficking coconspirators (collectively, the "Marijuana Targets"). [21-6676-6687-MPK]. As discussed below, these warrants were executed on December 13, 2021.

### Background of the Investigation

15.     Since approximately January 2021, investigators with DEA have been conducting an ongoing investigation into the Target Subjects, who are believed to be involved in laundering large quantities of U.S. currency, including drug proceeds and proceeds from stolen gift cards, and conducting an unlicensed money transmitting business. Based on the investigation to date, including the examples provided herein, investigators believe the Target Subjects are involved in numerous illegal schemes to transmit and launder tens of millions of dollars in illicit proceeds.

16.     Many of the Target Subjects are related to one another by marriage or blood. Based on the investigation to date, investigators believe that: ZHANG and ZENG are (or were) married; QIU FANG, WEI QING, and ZENG are siblings; and XIAN RONG is ZHANG's brother. Although LIU, DA, and FENG are not known to be related to the remaining Target Subjects,

investigators believe they are all from the same Fuzhou province in China, and all speak the same dialect of Chinese.

17.    Based on the investigation to date, investigators identified the various roles of the Target Subjects, and telephones used by each:

    a.    **LIU** was the user of TT1 until December 2021, when investigators seized this device.  Investigators believe LIU distributes large quantities of marijuana and launders his drug proceeds through ZENG;

    b.    **ZENG** is the user of TT2 and TT3 and is the registered owner (with ZHANG) of China Gourmet restaurant in Boston's Chinatown neighborhood.  According to corporate filings, this business is registered to 23 Tyler Street in Boston (the Target Location 1 building), and ZENG and ZHANG, the registered owners, list their address as Target Location 4, although investigators believe ZENG and ZHANG's primary residence is in New Hampshire.  Based on the investigation, investigators believe ZENG is a large-scale money launderer (including laundering drug proceeds for LIU), and operates an unlicensed money transmitting business out of her China Gourmet business, all while working closely with the remaining Target Subjects;

    c.    **ZHANG** is the user of TT4 and owns China Gourmet with ZENG.  Public records indicate that ZHANG is also a registered owner of a company called Wonderful Electronics/Wonderful Trading, which is registered to ZHANG's former home address in Hanover, Massachusetts, and is listed as a business involved in buying and selling electronics and restaurant supplies.  ZHANG also previously registered a predecessor entity called "Wonderful Electronic Group, Inc." in 2014 as a business involved in the "electronic wholesale business," which was registered to Target Location 4.  Based on the investigation, investigators believe ZHANG operates a large-scale money laundering operation (including laundering proceeds from stolen and/or fraudulent gift cards through an elaborate trade-based scheme involving the purchase and international shipment of Apple products), and also operates an unlicensed money transmitting business out of China Gourmet.  As stated above, investigators believe ZHANG's primary residence with ZENG is in New Hampshire;

    d.    **FENG** is the user of telephone number 617-659-7117 ("FENG Phone").  FENG is believed to work with ZENG and ZHANG in furtherance of their money laundering activities, including through Wonderful Electronics and a company called Best Offer Trading.  According to corporate filings, Best Offer Trading is owned by FENG, registered at the Target Location 1, and is engaged in the multidisciplinary business of "electronic construction suppliers furniture trading."  Based on the investigation to date, investigators believe Best Offer Trading is a shell corporation

used by ZHANG and FENG to facilitate their money laundering. FENG's primary residence is believed to be Target Location 2;

e. **DA** is the user of telephone number 917-513-3077 ("DA Phone"). DA is believed to work with ZENG and ZHANG to coordinate large bulk cash deliveries in New York in furtherance of the money laundering and money transmitting business, and also works closely with ZHANG in Massachusetts on a trade-based money laundering scheme involving Apple products;

f. **WEI QING** is the user of telephone number 646-964-8870 ("WEI QING Phone"). WEI QING is believed to work with ZHANG and ZENG to launder and transport money, including through bulk cash deliveries. WEI QING's primary residence is believed to be Target Location 3;

g. **XIAN RONG** is the user of telephone number 646-789-2989 ("XIAN RONG Phone"). XIAN RONG is a registered director of the China Gourmet restaurant owned by ZENG and ZHANG and is believed to work with ZHANG and ZENG to launder and transport money, including through bulk cash deliveries. XIAN RONG's primary residence is believed to be Target Location 5;

h. **QIU FANG** is the user of telephone number 646-250-2557 ("QIU FANG Phone"), and also frequently uses the China Gourmet business telephone number 617-482-9888 ("China Gourmet Phone"). Investigators believe QIU FANG works at China Gourmet—in both the restaurant and the upstairs office that is Target Location 1—and works with ZHANG, ZENG, and others to conduct the unlicensed money transmitting business and launder large quantities of bulk cash. QIU FANG's primary residence is believed to be Target Location 4.

## Marijuana Trafficking Background

18. As set forth below, investigators identified LIU as a large-scale supplier of marijuana who laundered his drug proceeds by delivering bulk cash to ZENG at her China Gourmet restaurant/Target Location 1 in Boston's Chinatown neighborhood. ZENG then structured and wired these proceeds to various accounts in the U.S. and China.

19. Investigators initially identified LIU as a suspected supplier of marijuana after investigators made two large, independent, seizures of marijuana (approximately 320 pounds on January 5, 2021, and approximately 78 pounds on January 7, 2021) from individuals who appeared to be unrelated, but who were each in contact with LIU via Target Telephone 1.

20.     Following these seizures, investigators conducted extensive physical and electronic surveillance of LIU.  During the course of this surveillance, investigators observed several vehicle-to-vehicle transactions which were consistent with narcotics deliveries conducted and/or coordinated by LIU.  For example, on February 18, 2021, investigators surveilled LIU as he delivered a large trash bag from his vehicle to a third party's vehicle.  When investigators stopped that third party's vehicle, they located approximately 20 pounds of marijuana—worth approximately $40,000—inside the large trash bag delivered by LIU.  Investigators also intercepted numerous conversations in which LIU used TT1 to discuss his extensive marijuana trafficking business.

21.     Based on the overall investigation, and the numerous interceptions over LIU's TT1, on December 13, 2021, investigators obtained 16 residential search warrants of various homes and/or stash houses, including those related to LIU.  As a result of these warrants, investigators seized of a total of approximately $270,000 in cash, over 500 pounds of marijuana, and two firearms.  Specifically, from LIU's two residences, investigators seized approximately 98 pounds of marijuana, 45 cartons of suspected contraband Chinese cigarettes (which investigators believe LIU was also selling illegally), approximately $158,750, and several cell phones (including TT1, which investigators seized and searched).  LIU was located at one of his residences at the time of the warrant executions and refused to speak with investigators.  Additionally, at a stash house in Needham that was being used by several of the Marijuana Targets (the "Needham Stash House"), investigators seized approximately 342 pounds of marijuana.

22.     Several days before the above-referenced search warrants were executed, on December 8, 2021, investigators conducting physical surveillance observed a white van deliver approximately 20-25 large cardboard boxes to several of LIU's marijuana coconspirators outside

the Needham Stash House.  The driver of the van, later identified as Kwok Ng, helped carry these boxes into the Needham Stash House.  Ng was then seen walking out of the Needham Stash House carrying a large black duffle bag, which he carried into the white van.  Investigators followed Ng as he drove the van away from the Needham Stash House and executed a traffic stop of the vehicle.  At this time, Ng was identified as the driver of the van, based on his New York driver's license.  Inside the van, investigators located the black duffle bag, as well as a blue laundry-style bag, containing a total of approximately 30 pounds of marijuana.  Investigators believe Ng delivered 20-25 boxes full of marijuana to the Needham Stash House.  Investigators further believe at least some of the marijuana delivered by Ng was located and seized from inside the Needham Stash House five days later, when investigators executed the search warrant at that location and recovered the 342 pounds of marijuana.

## Marijuana Proceeds Laundering Scheme
### *ZENG, LIU*

23.     Based on the entire investigation, including 30 days of intercepted communications of LIU's TT1, and months of physical and electronic surveillance of LIU, his home, his phone, and his vehicle, investigators believe LIU's primary source of income was marijuana trafficking.  Investigators also believe LIU supplemented this income with the sale of contraband Chinese cigarettes, but do not believe LIU had any legitimate job.  Thus, investigators believe that any cash possessed by LIU represented, primarily, drug proceeds.

24.     Throughout the investigation, investigators conducting surveillance observed LIU conducting frequent bulk-cash money transfers, which investigators believe represented proceeds from LIU's marijuana trafficking business.  For example, in March 2021, investigators seized approximately $30,820 in bulk cash delivered by LIU to a third party.

25.     The majority of LIU's cash drug proceeds, however, were delivered to ZENG at China Gourmet/Target Location 1 for laundering.  The wiretap interceptions—including the examples set forth below—made clear that LIU delivered bulk cash proceeds to ZENG on multiple occasions and that ZENG then laundered those proceeds into one or more bank or electronic fund accounts for LIU, in exchange for a "fee" or small percentage of the total amount sent.

*October 3, 2021: LIU Laundered Approximately $60,000 to ZENG, Who Brought the Funds to the area of Target Location 1*

26.     On October 2, 2021, at approximately 4:01 p.m., ZENG used TT3 to call LIU on TT1:[1]

| | |
|---|---|
| ZENG: | Hi |
| LIU: | Older sister, are you waiting for money? |
| ZENG: | Yes, have you started work? |
| LIU: | Huh? |
| ZENG: | Have work started? |
| LIU: | Nothing and I know the reason. |
| ZENG: | What is it? |
| LIU: | The reason being it is the national holiday in China right now. |
| ZENG: | The national holiday doesn't affect us. |
| LIU: | There is no account to receive the money. |
| ZENG: | [S]he can bring me the money first even if there is no account to receive the money. Less things to bring, let me use it first. Then we wait for the account. |
| LIU: | No, the account shrunk/locked. |
| ZENG: | It is not related to the national holidays. You can let him/her use your account first. |
| LIU: | No, my account is full. I have been receiving for 10 months. I receive and transfer out. I receive and transfer out. |
| ZENG: | Just give it to him/her, it doesn't matter. Just bring the money over for me to use. |
| LIU: | Ha Ha |
| ZENG: | Yeah, have a chat with him/her, get the account and we will send it. Tell him/her to show support. |
| LIU: | Sister... |
| ZENG: | Support? Bullshit, [s]he disappears when I need him/her. (voices overlap) |
| LIU: | Situation is hard right now. (voices overlap) |
| ZENG: | (voices overlap) |

---

[1] Translations provided for this call, and all other intercepted calls and/or messages herein, include rough translations.

| LIU: | Received the money (voices overlap) |
|---|---|
| ZENG: | Bullshit, then where is the money at? Tell him/her, sister (Zeng) is having a hard time so bring some money over. |
| LIU: | Uh OK. |
| ZENG: | Tell him/her to bring 10 over. Just talk to him/her. |
| LIU: | OK. |
| ZENG: | Hurry and do it. (inaudible) |
| LIU: | OK. |

27.     Based on the investigation to date, I believe ZENG was demanding that LIU and/or a coconspirator deliver cash to ZENG. I believe ZENG was insistent that LIU deliver the cash soon because ZENG uses cash in furtherance of her unlicensed money transmitting business and was running low. I believe ZENG asked LIU to use one of his bank accounts to accept the equivalent electronic funds because another account was unavailable due to a holiday in China. I believe LIU said he could not use his account because his account already had too many incoming and outgoing transfers in the past ten months, and any further transfers might arouse suspicion with the bank. I believe this suggests LIU is using his bank account as a pass-through account for his money laundering with ZENG.

28.     The following day, October 3, 2021, at approximately 9:07 p.m., LIU called ZENG on TT3. The following is an excerpt from the conversation:

| LIU: | The situation now is like this: I have a few thousand myself, but for this person [s]he has no account to receive money. Since it's national holiday, [s]he can't place an order now. Normally, [s]he placed the order and wire the money directly to the other business. Due to the national holiday, [s]he did not place any order. [S]he doesn't know anyone in China, so you send the money to me, and [s]he will take from me and send it. However, my account can't take too much money. Five or six is ok. |
|---|---|
| ZENG: | Shall I come over to get the money? |
| LIU: | Either way is fine. |
| ZENG: | [it] |
| LIU: | You don't need to count the money here? |
| ZENG: | No. |
| LIU: | Ok, send the money in three transactions. Each time about 50-60,000. I already got the money from him/her. |
| ZENG: | What do you mean? |

| LIU: | [S]he wants the money in three transactions. Each transaction for 50-60,000, we need to send it quickly. |
| ZENG: | Ok, bring me all the money. |
| LIU: | What? |
| ZENG: | Bring me the whole amount. |
| LIU: | I already told him/her. |
| ZENG: | I can send his/her money to where they want, I don't need to use your account. |
| LIU: | No, sis. [S]he has no account to receive money right now but needs to send the money urgently, so I said I can take the money as middle man with my accounts. |
| ZENG: | Tell him/her to give you the whole money. |
| LIU: | I don't have his/her money yet. The 50-60,000 I give you is my money. |
| ZENG: | Tell him/her. |
| LIU: | [S]he is not here, [s]he went to PA. But [s]he told me [s]he already saw the fund, however now the 50-60,000 is my money. When you receive the money, transfer to my account and I will wire it. When [s]he comes back, I will get the money and give it back to you. |
| ZENG: | Good, do you want me to come over? |
| LIU: | That's fine. |
| ZENG: | Give me the address. |
| LIU: | Ok. |

29.     I believe LIU and ZENG were continuing to discuss the logistics for how to collect and wire the money for these transactions. I believe LIU told ZENG that he did not have the third party's money yet, but could bring ZENG his own money, which he estimated to be $50,000-$60,000. I believe LIU explained to ZENG that he was fronting the money for the third party and would get the money back when the third party returned from Pennsylvania. I believe LIU told ZENG he would send her an address at which they could meet to exchange the cash, and that ZENG would then wire the equivalent to LIU's account.

30.     At approximately 9:17 p.m., LIU called ZENG and told her to meet at 2 Hancock Street, Quincy, Massachusetts.[2] At approximately 9:50 p.m., GPS data indicated that LIU's

---

[2] Investigators executed a search warrant at this address in December 2021 and located approximately 30 pounds of marijuana inside—this address was one of two residences used by one of LIU's marijuana coconspirators.

vehicle arrived at a residence in Quincy used by one of LIU's marijuana coconspirators.[3] Investigators viewed pole camera surveillance outside this residence and observed LIU exit his vehicle and walk to the front door of the residence. An unidentified female opened the door and handed LIU a white/gray bag, which LIU carried into his vehicle before driving away. At approximately 9:56 p.m., GPS data for LIU's vehicle indicated that it arrived at the prearranged meeting location at 2 Hancock Street in Quincy. At this same time, court-authorized precise location information for ZENG's TT2 indicated that it too was located in the area of 2 Hancock Street in Quincy, which I believe confirms that ZENG and LIU met to exchange the $60,000 LIU had discussed on the calls and text messages.

31.     At approximately 10:08 p.m., investigators observed (via pole camera surveillance) ZENG arrive and park outside Target Location 1. She walked up the exterior stairs and into the Target Location 1 building carrying the white/gray bag LIU had retrieved. Investigators were unable to see which floor within the building ZENG entered. Based on the above and the investigation to date, I believe LIU retrieved $60,000 in drug proceeds from his marijuana coconspirator in Quincy, which he then delivered to ZENG at or near a marijuana stash location, to be further laundered via electronic transfers.


*October 9, 2021: LIU Delivered ~$40,000 to ZENG at her Former Residence*

32.     On October 9, 2021, at approximately 8:43 p.m., LIU called ZENG and asked, "Sis, can you transfer money right away today yes or no?" ZENG confirmed and asked, "How many?" I believe ZENG asked LIU how much money he would bring her to launder. LIU stated that it would be "4 units." Based on the investigation to date, and hundreds of intercepted

---

[3] This is the same coconspirator who utilized 2 Hancock Street, Quincy, and was responsible for the 30 pounds of marijuana found inside in December 2021.

communications, I believe the Target Subjects use "units" to refer to quantities of $10,000. Thus, I believe LIU told ZENG he would be delivering $40,000. ZENG and LIU then went back and forth discussing logistics and ultimately LIU said that he would drop the money off to ZENG if she gave him an address.

33.    Shortly after 8:45 p.m., court-authorized GPS tracking data for LIU's vehicle indicated that the vehicle left LIU's residence. At approximately 8:49 p.m., LIU called TT3 and told ZENG, "Sis, I am on my way. I just got $39,000. You help me send $40,000 first. The $1,000 I will give it to you with last time's water money next time." I believe LIU told ZENG that he only had $39,000 in cash but needed to transfer $40,000, so asked if ZENG could front or loan him the missing $1,000 to be repaid at a later date. ZENG told LIU that would be "fine." According to GPS data for LIU's vehicle, LIU stopped briefly on Taber Street in Quincy, Massachusetts, where I believe he retrieved the $39,000-$40,000. LIU's vehicle then headed south toward ZENG's then-residence in Hanover.

34.    At approximately 8:53 p.m., LIU called TT3 to discuss logistics for the money delivery. ZENG instructed LIU to "drive right in and leave it in the front of our door. Leave it at the door and send me a message, then I will come out and get it." At approximately 9:12 p.m., GPS data indicated that LIU's vehicle arrived in the area of ZENG's residence in Hanover. LIU called TT3 to confirm that he was in the right location at ZENG's residence: "Sis, is it the one with a purple neon light on second floor?" ZENG confirmed that was correct. GPS data indicated that LIU's vehicle drove away from ZENG's residence not long after it arrived, at approximately 9:14 p.m. Shortly thereafter, investigators conducted physical surveillance of ZENG's residence and confirmed that there was a purple light on the second floor of her residence.

35.    Based on the conversation and observations above, I believe ZENG coordinated a $40,000 money laundering transaction with LIU. I believe LIU drove from his house to deliver

the cash drug proceeds to ZENG's residence in Hanover, so that ZENG could launder $40,000 total (fronting LIU $1,000). Based on this transaction, I believe ZENG uses her residence(s) to store and/or process cash for her money laundering and/or money transmitting business. As a result, I believe ZENG is likely to keep cash and currency in her primary residence.

*October 24, 2021: LIU Delivered ~$70,000-$80,000 to ZENG, Who Brought the Cash to the Area of Target Location 1*

36.     On October 24, 2021, at approximately 11:53 a.m., ZENG called LIU from TT3. LIU told ZENG that he might have $70,000-$80,000 for her today, around dinner time. Later that night, at around 8:04 p.m., ZENG called LIU from TT3 and asked, "Are you going to look for me?" I believe ZENG was asking if LIU was going to be delivering the $70,000-$80,000 he mentioned earlier. LIU responded, "Yes, but it's going to be in a little while." The two then coordinated logistics, and eventually investigators observed as LIU picked ZENG up at one of her restaurants in Jamaica Plain and brought her to the area of Target Location 1. Once they arrived outside Target Location 1, investigators observed LIU and ZENG walk into the Target Location 1 building together, while LIU was carrying a large, white tote bag under his arm. Investigators were unable to see whether the two entered the restaurant on the first floor or went up to the second floor to Target Location 1.

37.     Based on these discussions and observations, I believe LIU coordinated a meeting with ZENG so LIU could deliver approximately $70,000-$80,000 in bulk cash. I believe LIU picked ZENG up and brought her to the Target Location 1 building in Chinatown, where he carried the cash inside the tote bag into the Target Location 1 building, so that ZENG could further launder the money.

38.     I further believe, based on the investigation to date, and LIU's active marijuana trafficking business, that the money delivered in this transaction and the other two transactions described above, represented proceeds from illicit activities, including drug trafficking.

*Aftermath of Search Warrants related to LIU*

39.     As discussed above, on December 13, 2021, investigators executed numerous search warrants, including on LIU's residences.  Among other items, investigators seized LIU's TT1.  On TT1, investigators identified communications between LIU and ZENG via the WeChat encrypted messaging application in which the two appear to be discussing the logistics for wire transfers ZENG was conducting on LIU's behalf.  For example, on December 1, 2021, investigators located a series of WeChat communications between LIU and ZENG in which LIU appears to provide instructions to ZENG on amounts of Chinese currency he would like her to wire on his behalf which, when converted to U.S. dollars, appears to reflect over $140,000 in funds to be wired.  Investigators believe these messages relate to electronic transfers of funds representing bulk cash drug proceeds delivered by LIU to ZENG, and that such transfers constitute money laundering transactions.

40.     Investigators were also intercepting ZENG's telephones at the time of the search warrant executions related to LIU.  Although investigators did not intercept any wire communications between LIU and ZENG in the aftermath of the search warrants, ZENG did attempt to contact LIU's TT1 approximately five times between December 16 and 17, 2021, while investigators were in possession of TT1.  ZENG was also intercepted as she discussed the events regarding LIU with FENG and ZHANG on December 17, 2021.  ZENG told FENG that a third party told her about "Sam" (LIU) having his and his friends' houses raided, and that LIU was involved with drugs.  ZENG told FENG that she texted LIU to check on him, and that LIU stated

that he and his close friends were OK but that he would not be coming out for a while. Investigators believe LIU told ZENG he would not be "coming out for a while" to see her to deliver bulk cash drug proceeds because he was trying to avoid further law enforcement attention and/or because investigators had seized over $150,000 in suspected drug proceeds from LIU's home, so he would need time before he had more funds to launder with ZENG.

41.     ZENG also told ZHANG about LIU's house being searched. ZENG and ZHANG discussed that they needed to be careful because ZENG had invited LIU to go to her shop (believed to be China Gourmet and/or Target Location 1) and the cameras in Chinatown could have captured his visits. I believe ZENG and ZHANG were discussing that LIU had come to China Gourmet to deliver bulk cash on prior occasions and that they were concerned because they knew Boston authorities had pole cameras around Chinatown which would have captured LIU's deliveries. Indeed, Boston Police pole cameras in Chinatown had captured LIU as he delivered suspected bulk cash to ZENG at China Gourmet and/or Target Location 1 on multiple occasions. I believe these discussions confirm that ZENG was aware that her financial transactions with LIU were illegal, and she was concerned that law enforcement attention on LIU might lead to her.

### Bulk U.S. Dollar Exchanges for Chinese Renminbi Background
### *ZHANG, ZENG, QIU FANG*

42.     Investigators believe ZHANG and ZENG are intimately involved in unlicensed money transmitting and money laundering by accepting illicit proceeds in the form of U.S. dollars ("USD") and "selling" that cash to individuals in the United States, while accepting the equivalent value in the form of wire transfers in Chinese Renminbi ("RMB") currency. When conducted by unlicensed and unregistered individuals, I believe engaging in these cash-for-RMB transactions constitutes unlicensed money transmitting business in violation of 18 U.S.C. §1960. I further

believe that when the cash used to facilitate these exchanges constitutes proceeds of drug trafficking or other specified unlawful activity, these transactions can constitute money laundering offenses, in violation of 18 U.S.C. §§ 1956 and/or 1957.

43.     Based on my knowledge of money laundering and black market currency exchanges, the individuals conducting these transactions often offer a discount from the currency exchange rate between RMB and USD for those looking to pick up USD, and charge a fee for those looking to launder USD.  Based on my training, and experience, I believe brokers are able to offer this discount to customers seeking cash because they are being paid a commission by customers looking to launder the cash.  Because the cash constitutes illegal drug proceeds, criminals are willing to pay a fee in order to move and clean their proceeds.  This fee from those delivering cash offsets the discount offered to those retrieving cash.  This illegal scheme benefits all parties.  By charging a fee and offering a discount less than that fee, the broker still profits from the transaction.  The criminal's drug proceeds never enter the U.S. banking system and effectively avoid U.S. banking reporting requirements and law enforcement detection.  Chinese customers in the U.S. can acquire USD at a discount, all while avoiding China's capital flight limits, which prevent Chinese nationals from transferring large quantities of money out of China and thereby limit access to funds for those in the U.S.

44.     Based on the investigation to date, as detailed below, investigators believe ZHANG and ZENG are charging a fee to accept USD drug proceeds in Boston and New York in exchange for RMB wire transfers, and are therefore able to offer a discount on the flip side of those transactions, where customers want USD in Boston and were willing to wire RMB to ZENG/ZHANG.  Based on the overall investigation, I believe the cash-for-RMB transactions

conducted by ZENG and ZHANG described herein involve cash derived from drugs and other specified unlawful activity.

*ZHANG and QIU FANG's Money Laundering/Money Transmitting Within Target Location 1*

45.    In March of 2022, investigators discovered an open source advertisement on "weiming.info" offering to sell USD in exchange for RMB.  According to the posting, the RMB must be paid first, and USD will be credited to the purchaser's account within 24 hours. The author also lists "boa, citi, chase, wells fargo, capital one checking or credit card" as acceptable banking vendors.  The advertisement listed TT4 as the contact number for such exchanges.  Although the contact email was partially obscured on the public posting, copied below, it was consistent with ZHANG's known email address of ZHANGSHIRONG@gmail.com.   As such, investigators believe ZHANG created the advertisement to promote his money transmitting and money laundering business.



46.    Over the course of the investigation, investigators have observed and monitored ZHANG as he engaged in transactions consistent with the above solicitation.  For example, on February 23, 2022, ZHANG received an incoming call from 617-852-8896 (UM8896), where

UM8896 and ZHANG (a/k/a "Allen") had a lengthy conversation about UM8896 purchasing USD

from ZHANG. Below is a transcript of the introductory part of the conversation:

| | |
|---|---|
| ZHANG: | Hello? |
| UM8896: | Hi Allen, I want to inquire something from you. Have you exchanged money with John Luck from NYC? W-O-H-E. |
| ZHANG: | I don't know this person. |
| UM8896: | Oh you don't know him/her? |
| ZHANG: | Yes, and I've done business with so many people. It can't tell anything about that person if he/she had exchanged money with me. Because anyone who exchanges money with me, they transfer me the money first. Even if they did business with me in the past, it does not prove that they are creditable. People knows my name around here, so they transfer to me first, then I do my part. |
| UM8896: | Oh... |
| ZHANG: | I would not transfer to others first. So there are a lot of people who did business with me, but it does not mean anything. |
| UM8896: | Okay, I see. I want to exchange, um, but my company is not yet set up. I can exchange money with you after it is launched. But I need to exchange money with you personally now. My money order and BOA pay do not work because the amount exceeds the limit. I cannot directly exchange with you. |
| ZHANG: | Where are you located now? |
| UM8896: | Right now I am in Philadelphia, near D.C. I sometimes go to NYC. But, are you in Boston? It is too far for me to get there. |
| ZHANG: | It is not a problem. I can give you an address of NYC, you can pick it up there. |

47.    I believe ZHANG explained that he conducts his money transmitting/currency

exchange business with many people and is well known in the community.  I believe ZHANG

explained that he does not feel the need to vet new customers extensively because he always

receives RMB up front before releasing the USD, and therefore knows he is not being scammed

by any customer.  I believe UM8896 explained that he needed to use ZHANG's money

transmitting services because he wanted to transfer an amount that would otherwise trigger Bank

Secrecy Act reporting requirements ("exceed the limits") and was looking to avoid detection.

48.    ZHANG and UM8896 further discussed logistics and UM8896 asked ZHANG for

a "discount":

UM8896:    Um, right. Someone told me that there is a three point discount, I don't know
           if you can give me some discount.
ZHANG:     I suggest, I can do a one point discount, but this type of business, safety
           first. Also, I have to earn money out of it. If I make too little profit, or you
           find someone else who offers more discount, but I think safety is the number
           one thing. You cannot make money out of this. You should make money
           out of your business. If you get more discount, you are in risk. It is bad when
           you are at risk. Many people did not believe that, but they were all in
           trouble. But I am safe. You have to find long-term, safe, you must do it
           through other people. Also it is safer if the profit points are enough. If we
           do not have enough profit points, we can't even afford to send people to
           places. It is not safe. There is not a lot of money, but you have to let us earn
           that money. I got to let you know. You may just step your feet into this
           business and know nothing.
UM8896:    Right.
ZHANG:     I've been in Massachusetts for a long time, we have a lot of places that
           failed. They did not exchange with me but some other people in NYC. Then
           their money were all gone. It involves a lot, the gang and the police, not
           safe.
UM8896:    Did people get scammed online?
ZHANG:     A lot. Basically, maybe I was scammed online too. Because you do this type
           of business, and you have your other business, but eventually you do not
           touch, you cannot. Because it is not safe. You do not do this type of
           business, you stay out. Let us handle it safely. You just use this money for
           your business.

49.    I believe UM8896 asked for a "three point discount" and ZHANG offered just a

one point discount in the exchange rate. Based on the above conversation, I also believe that

ZHANG knows that he is operating an illegal money transmitting business, and that the USD being

sold represents illegal proceeds. I believe that ZHANG explained to UM8896 that it is safe to buy

USD from ZHANG because the proceeds are now one-party removed from the illicit source, and

I believe that ZHANG was only willing to offer a one-point discount because he was assuming all

the risk by knowingly receiving proceeds, which allows his customers (i.e. UM8896) to maintain

plausible deniability as to the source of the USD. I believe that ZHANG explained this to

UM8896, stating that UM8896 would get a bigger discount if he were to purchase USD directly from a source of the proceeds (and cut ZHANG out); however, UM8896 would be assuming a lot more risk if he were to do so. In addition, I believe that ZHANG also acknowledged that the act of selling USD in exchange from RMB and laundering proceeds is illegal ("It involves a lot, the gang and the police, not safe.").

50.     Based on these intercepted calls and ZHANG's public advertisement, in April 2022, at the direction and under the supervision of investigators, a confidential source ("CS")[4] contacted ZHANG about purchasing USD.  In early May 2022, ZHANG agreed to sell USD to CS, and instructed CS to further discuss the transaction on WeChat, instead of TT4, because it was "safer."  Again, I believe this demonstrates ZHANG's knowledge that his money transmitting is illegal.  At this point, ZHANG provided his WeChat username: tyger99.  Through their communications on WeChat, ZHANG agreed to sell CS approximately $100,000 USD, and instructed CS that the pickup of the money would take place at 23 Tyler Street, Boston, at noon on May 10, 2022—the address of Target Location 1.  CS informed ZHANG that he/she would be sending a driver to pick the money up.  ZHANG also informed CS that the USD would not be released until ZHANG received the equivalent in RMB.  ZHANG instructed CS to have the RMB equivalent of $50,000 USD wired to each of two separate RMB accounts in China: (1) Wenfang ZENG, China CITIC Bank, Fuzhou Branch, Account #6217681302295608 and (2) Chen WU, China CITIC Bank, Fuijian Province, Fuzhou City Branch, Account #6217681302291334.  Based on the investigation to date, investigators believe Chen Wu and Wenfang Zeng to be husband and wife and believe Wenfang Zeng to be related to ZENG.

---

[4] CS is cooperating in exchange for compensation.  CS has worked with law enforcement for an extended period of time and CS's work has led to the seizure of  over $10 million in drug proceeds, large quantities of narcotics, and has led to over 25 arrests in other cases.

51.     On May 10, 2022, at approximately 12:10 p.m., investigators conducted surveillance outside Target Location 1, prior to the purchase/pick-up of approximately $100,000 USD from ZHANG.  Investigators equipped an Undercover Agent ("UC") posing as CS's "driver" with an audio/visual recording device and dropped UC off in the vicinity of Target Location 1 at approximately 12:31 p.m.  At approximately 12:32 p.m., UC walked into the Target Location 1 building, proceeded up a set of stairs to the floor above the China Gourmet Restaurant, and to the entrance door for Target Location 1.  ZHANG opened the door to Target Location 1 and brought UC inside.  Once inside Target Location 1, UC and ZHANG proceeded into to an office space. ZHANG then told UC that he was going to call CS to confirm that UC was authorized to retrieve the funds.  ZHANG called CS and said, "Your friend is here, you can talk to him and confirm. Can you hear me?  Your friend is here, can you make a call to him to confirm?  Hold on I will pass him the phone."  UC and CS then had a brief conversation to acknowledge one another, before UC handed the phone back to ZHANG.  ZHANG asked CS to confirm, "Hello?  Is that him?  Is him. Oh ok…. Let's wait for the transfer."  ZHANG then proceeded to bring out a large quantity of bundled bulk USD and began counting each bundle.

52.     ZHANG and UC then engaged in casual conversation and discussed future transactions.  ZHANG stated that, next time, "Just come up and no one see you and then you count them and you leave."  I believe ZHANG was saying that he now trusted UC, and that future transactions could be even easier.

53.     UC then discussed the possibility of future currency transactions with ZHANG:

UC:         Do you have a lot of volume?
ZHANG:      Not really a lot, took me a few days to gather them.
UC:         Oh.  I know my boss said they have a customer who needs a large volume
            of goods.  So, I am not sure if they will get it from you.
ZHANG:      I don't know what you mean by large volume.

| UC: | They told me maybe sixty (60) but it's going to split up into three times? Just like what we are doing now, split into a day or two. |
| ZHANG: | Sixty, sixty is fine.  It's just that the RMB accounts are not very stable. |
| UC: | [Voices overlap] Correct, correct, correct. |
| ZHANG: | Lately and it's hard to receive.  I do have the stuff. |
| UC: | Good. |

54.     I believe that ZHANG told UC that he could easily handle $600,000 (60 units of $10,000 each), but added that USD was easier to come by, while it was difficult to find accounts in China to receive RMB.  I believe this may be due to new anti-laundering regulations that went into effect in China earlier this year.

55.     ZHANG and UC engaged in more small talk while waiting for the RMB transfer to be complete, then ZHANG provided UC with a money counter to count the USD.  ZHANG told UC that their money counter was the "same as the banks, and it will recognize fake bills."

56.     At this time, a female entered the office space outside of camera view, who investigators believe to be QIU FANG.  Minutes earlier, at approximately 12:43 p.m., investigators conducting surveillance outside Target Location 1 had observed a female believed to be QIU FANG exit 23 Tyler Street and approach a mini-van that was idling in the street in front of the restaurant.  Investigators observed QIU FANG retrieve a small black bag from the driver of the mini-van before re-entering 23 Tyler Street.

57.     After UC counted the money, ZHANG confirmed that the RMB was received, and UC departed with the USD.

58.     Following this May 10 transaction, CS was in touch with ZHANG about additional money pickups, including on May 25, 2022, for $150,000.  ZHANG passed CS seven different Chinese bank accounts into which CS should transfer the equivalent funds.

59.     On May 25, 2022, investigators again equipped UC with an audio/visual recording device and dropped UC off in the vicinity of Target Location 1, at approximately 1:52 p.m.  UC walked upstairs and knocked on the frosted glass door leading to Target Location 1.  When no one answered, UC exited the building and waited outside for ZHANG to arrive.  A short time later, ZHANG arrived in a blue Mercedes Benz and greeted UC.  ZHANG then led UC upstairs and inside Target Location 1.  ZHANG again brought UC into the office space within Target Location 1. ZHANG then directed a female, later determined to be QIU FANG to "bring the stuff out here… make it quick."  QIU FANG asked if ZHANG "need[ed] a bag for him to hold" the money in.  ZHANG and QIU FANG then walked out of the office and into an adjoining room within Target Location 1 and each returned with multiple bundles of cash, which they placed in front of UC.  UC asked if they had a money counting machine, and QIU FANG responded, "I will bring the machine over, we just counted."  QIU FANG then proceeded to retrieve the money counting machine and place it also in front of UC on the desk.

60.     ZHANG asked UC if CS had wired the money yet, and UC confirmed that it would be wired to the seven accounts.  ZHANG stated that he had provided seven accounts because "it's not good to wire too much money to an account in China…they will freeze the funds if the source is not legit.  You can't put too much money in there."  I believe ZHANG was again acknowledging that the funds he was transferring were illegitimate and was attempting to avoid detection of his money laundering and unlicensed money transmitting.

61.     After UC finished counting the money, ZHANG offered UC a bag in which to store the money.  UC then told ZHANG that UC's boss (CS) wanted UC to come pick up a very large transaction.  ZHANG responded that "if the stuff is too much then risk runs high…if we do 10 something each time, it's easier for both sides to absorb.  If it is 30, 40 units, then the nature will

be different."  I believe ZHANG explained to UC that moving $300,000-$400,000 at a time was too risky because it might attract law enforcement and/or banking attention.  UC suggested that he could do $150,000-$200,000 at a time, once in the morning, once in the afternoon, and once in the evening, and ZHANG agreed.  ZHANG explained, "We've been doing this for a long time.  I don't know how long you have been doing it.  For us, like we have a restaurant, and we have a lot of income, but it's our money.  If there's too much we can't explain it, and it will be confiscated…I don't know if you've had an accident in the past.  Things happen when you've been in the business for long enough.  Something will go wrong.  Eventually you will hit a wall.  If you are not careful."  I believe ZHANG was warning UC against moving too much money too quickly and explained that he (ZHANG) was able to move large quantities of money because they could pretend it was income from the China Gourmet restaurant.

62.     ZHANG also suggested that the next time they met to conduct a transaction, UC could come right up to Target Location 1 without greeting ZHANG because he would just look like any other customer of the restaurant in case anyone was watching the cameras around Chinatown: "Like from the police or something.  Why we like it here is because we are a restaurant, people come and go.  You come to Chinatown and buy some food and leave, who knows.  Right?"  I believe ZHANG admitted that he liked conducting his money transmitting and money laundering business within his restaurant because the restaurant provided legitimate cover for their illegitimate activities.

63.     ZHANG continued to discuss the money laundering and/or transmitting business and told UC that he had previously had an "accident" in New York and lost a "few hundred units" (representing millions of dollars, at $10,000 per unit).  ZHANG complained, "There's too many, not to say about the law enforcements, even among us, we will suspect each other.  The amount is

too big…. Don't say other people don't know it.  Doubting each other. That's why I don't like to do large amounts.  In case somethings happened, it's easier to deal with. Safety first within our comfort zone."  I believe ZHANG was explaining that he likes to break up larger transactions into multiple smaller transactions in case anything goes wrong—be that law enforcement seizing the money or competitors robbing him.  After additional small talk, UC departed Target Location 1 with the $150,000 in USD delivered by ZHANG and QIU FANG.

64.     Since then, CS and ZHANG have continued to discuss this next, larger transaction, and have discussed breaking the transactions into several smaller transactions to be conducted during the week of June 20, 2022.

*ZENG and QIU FANG's Money Laundering/Money Transmitting Within Target Location 1*

65.     Along with her laundering of suspected drug proceeds from LIU and others (discussed above), the investigation to date has revealed that ZENG (like her husband ZHANG) regularly conducts money transmitting business, including exchanging bulk cash for wire transfers to and from China, from within Target Location 1, with the assistance of her sister, QIU FANG.

66.     According to open source information, a "MoneyGram" money transmitting business was previously operated out of China Gourmet but now appears to be closed.  The storefront window for China Gourmet currently advertises money remitting services and has a sign for the "Sigue" money transmitting company, although Sigue's website does not indicate any business at (or near) China Gourmet/Target Location 1.  According to FinCen, there is no registered money transmitting business for ZENG, ZHANG, or China Gourmet.  Based on this, I believe the Target Subjects are not licensed and/or registered to conduct money transmitting business.

67.     Nevertheless, during interception of ZENG's phones, investigators intercepted dozens, if not hundreds, of calls in which ZENG discussed and/or coordinated wire transfers—the following paragraphs include just several examples of ZENG's active business in this area, including with ZHANG and QIU FANG.

68.     For example, on November 24, 2021, ZENG spoke to QIU FANG (via QIU FANG Phone):

| | |
|---|---|
| QIU FANG: | This person comes in asking to exchange one thous... ten thousand. It's for wire transfer. |
| ZENG: | Huh? |
| QIU FANG: | He said he is exchanging ten thousand for wire. |
| .... | |
| ZENG: | Did he say what he like it to be transfer to? |
| QIU FANG: | He said Alipay is fine. He says that, why don't you just give me $4,000 first. |
| ZENG: | Only wanting $4,000? |
| QIU FANG: | He said it already, he wants to wire $4,000 first. He added to WeChat already. This one is… |
| ZENG: | How come he doesn't want $10,000? |
| QIU FANG: | As of now, he only $4,000. Let me ask... |
| ZENG: | [Voices overlap] You can ask. If he wants it wired into Alipay or what? |
| QIU FANG: | [Aside: You want it with Alipay or what? ] |
| UM: | [Aside: It's okay, you can either do it with WeChat or Alipay.] |

69.     Based on the investigation to date, I believe QIU FANG told ZENG that a male had come in (likely to China Gourmet or Target Location 1) looking to receive bulk U.S. currency and send the equivalent value via wire transfer on Alipay or WeChat.

70.     On November 29, 2021, ZENG called ZHANG's TT4 from TT3:

| | |
|---|---|
| ZHANG: | Hello? |
| ZENG: | Hello? What's up? |
| ZHANG: | Xiao Lu texted me a message, asking for the stuff. |
| ZENG: | I see. Okay. |
| ZHANG: | Did he wire the money to you? |
| ZENG: | Yes. He did wire the money. |
| ZHANG: | Okay, okay. How much did he wire? |
| ZENG: | He only wired three pieces. |
| ZHANG: | Only want to have three pieces? |

| ZENG: | Yes. |
| ZHANG: | I see. It is less than expected. |
| ZENG: | He... no more, he said someone else got it first. Just say, someone else took ten. The other day... |
| ZHANG: | It happened long time ago, right? |
| ZENG: | No, not too long ago, we discuss about the exchange approximately two weeks ago. He said, you didn't mention about this, so someone else took them all. I set the time as seven o'clock, but I had to wait till eleven o'clock. Now he claimed that he was over the limit, so he can only do it through Alipay. I agreed to do the transfer over the Alipay. |
| ZHANG: | Here, I have a way to do it through Alipay, there is no limit for the amount of wiring money. |
| ZENG: | I see, but this time, there were only three pieces. |
| ZHANG: | Okay. Okay. |
| ZENG: | Bye. |

71.     I believe ZHANG and ZENG were discussing a money laundering transaction in which a third party wired $30,000 ("three pieces") to ZENG via Alipay in exchange for U.S. currency.  I believe ZHANG was expecting the third party to transfer more money.  Based on this and other calls during the investigation, I believe ZHANG works with ZENG and QIU FANG to facilitate the unlicensed money transmitting business.

72.     On December 3, 2021, at approximately 2:21 p.m., ZENG placed a call from TT2 to a male at 617-206-0371 (UM0371).  The following is an excerpt of their conversation:

| UM0371: | Hey, Boss lady. My wife have a relative here... |
| ZENG: | [Voices overlap] Uhm. |
| UM0371: | Was thinking about going to your place to wire money. |
| ZENG: | Oh. |
| UM0371: | Last time the money took too long to wire. |
| ZENG: | Oh. |
| UM0371: | This time I'm asking her to go there herself for that. |
| ZENG: | Oh, oh. |
| UM0371: | When are you going to be free? |
| ZENG: | When, what time? My sister is there. Come over. |
| UM0371: | How fast it can go there? |
| ZENG: | It's about ten days. |
| UM0371: | It take ten days? Can it be any sooner? |
| ZENG: | Is she in a rush? How much she wants to wire? |
| UM0371: | Wiring twenty thousand. |

…

73.     I believe UM0371 told ZENG that his relative wanted to wire $20,000 through ZENG's unlicensed money transmitting business ("Was thinking about going to your place to wire money… wiring 20,000").  I believe ZENG confirmed that she could do that and that UM0371 could bring the money to her sister (QIU FANG) at China Gourmet.  I then believe UM0371 asked if ZENG could rush the money so that it would arrive faster than the "ten days" the wire transfer would otherwise take.

74.     ZENG and QIU FANG discussed another large bulk cash delivery on December 4, 2021, at approximately 5:47, from TT3:

| | |
|---|---|
| ZENG: | Hello? Hello? |
| QIU FANG: | Little sister, did you say this person came to exchange money? Probably not? |
| ZENG: | If not, then should be another person. |
| QIU FANG: | If should be a male who goes often to exchange. |
| ZENG: | Not him. |
| QIU FANG: | It should be a male with a tall and big frame. |
| ZENG: | No, no. That's good, that's good. Come directly to exchange. |
| QIU FANG: | But, listen to me, the girl who came today will go exchange again tomorrow and she wants large bills. She will come over again tomorrow morning to exchange $5,000. Give her large bills ok. |
| ZENG: | Ok, ok. |

75.     As above, I believe ZENG and QIU FANG were discussing a bulk cash money laundering transaction in which a female third party had come into China Gourmet looking "to exchange $5,000" by receiving U.S. currency in large denominations.  I also believe they discussed other customers who utilize ZENG's money exchange services, including "a male who goes often to exchange."

76.     The following day, December 5, 2021, at approximately 1:29 p.m., ZENG called the China Gourmet restaurant and directed a female (believed to be QIU FANG) to "go upstairs to

check the total amount of cash." The female reported to ZENG that someone had picked up $5,000 in cash that morning and that the remaining cash was $14,000. I believe the ZENG asked QIU FANG to confirm the cash reserves being held inside Target Location 1 ("upstairs" from China Gourmet). I believe QIU FANG reported that they still had $14,000 in U.S. currency after a third party had picked up $5,000 in cash that morning. Based on the timing and content of these calls, I believe the female third party discussed in the December 4 call between ZENG and QIU FANG did in fact complete the $5,000 money laundering transaction when she retrieved $5,000 in cash on the morning of December 5, 2021.

77. On December 10, 2021, ZENG used TT2 to call an unknown female at 617-888-1777 (UF1777):

| | |
|---|---|
| UF1777: | Do you still wire money? |
| ZENG: | Yes. |
| UF1777: | If you still do wire money, then... |
| ZENG: | [Voices overlap] How much you are wiring? |
| UF1777: | [Voices overlap] How long does it take? I'm afraid it's like last time, I was in a rush to use that money. It took a month plus. |
| ZENG: | Oh. |
| UF1777: | I'm afraid of that. |
| ZENG: | How much you are sending? |
| UF1777: | Right now when I wire, I will send something like five (5) to six (6) thousand. |
| ZENG: | Oh. |
| UF1777: | Five (5) to six (6) thousand, it depends, it could be ten thousand ($10,000) something like that. |
| ZENG: | Oh, oh. |
| UF1777: | It depends. |
| ZENG: | [Voices overlap] Alright. |
| UF1777: | Right now, for no status person how much does it cost? |
| ZENG: | Uhm, uhm, uhm. |
| UF1777: | Huh? |
| ZENG: | Huh? |
| UF1777: | For not need ID's wire transfer, how much does it cost? |
| ZENG: | Oh, for right now? It's one hundred fifty ($150). |
| UF1777: | It's one hundred fifty ($150). |

| ZENG: | Uhm-hm. |
| UF1777: | How about with the ID how much does it cost? |
| ZENG: | [Voices overlap] Right now, with ID's the company is not allow send it. |
| UF1777: | What you can't send it. |
| ZENG: | Right now, the company hasn't open up yet. It's not working. |
| UF1777: | So, you have to do the no ID transfers. Right? |
| ZENG: | Oh. |
| UF1777: | It's no need ID for transferring? Oh, alright. |
| ZENG: | Uhm. |
| UF1777: | [Voices overlap] I like to make it clear. |
| ZENG: | [Voices overlap] Uhm, uhm. |
| UF1777: | How long does it take you to send it? |
| ZENG: | Uhm. |
| UF1777: | You must tell me. How long does it take? |
| ZENG: | [Voices overlap] It's about ten (10) days. |

78.     I believe UF1777 asked ZENG if she was continuing to operate a money transmitting business and stated that UF1777 had previously utilized ZENG's money transmitting business but was disappointed in how long it took for the money to arrive. I believe UF1777 was interested in wiring $5,000-$6,000 (or even up to $10,000) without having to provide an identification because UF1777 (or the person who would be actually wiring the money) did not have legal status in the U.S. I believe ZENG confirmed that she could wire that amount of money without any identification for a $150 fee and that it would take approximately 10 days to arrive.

79.     On February 20, 2022, QIU FANG called ZENG and explained that she "took the money upstairs just now" and that the person was "sending $10,000." When QIU FANG complained that the person only paid a $150 fee for the transaction, ZENG told QIU FANG that the person was an old customer, so the fee was fine. I believe QIU FANG accepted $10,000 in cash for a fee of $150, as part of her unlicensed money transmitting business with ZENG, and then brought that money up to Target Location 1.

80.     On February 22, 2022, at approximately 12:06 p.m., ZHANG received an incoming call from QIU FANG on TT4. ZHANG stated that he was on his way to pick up "four units,"

which is believed to be $40,000.  At approximately 3:14 p.m., investigators observed ZHANG arrive outside Target Location 1 and park.   At approximately 3:15 p.m., ZHANG placed another outgoing call to QIU FANG and announced his arrival.  He also inquired about the ongoing money transmitting business:

>   …
>
>   ZHANG:       I need to ask you this. Hello?
>   QIU FANG:    Okay, Speak, speak.
>   ZHANG:       For China Gourmet, is there people comes in for exchange money lately?
>   QIU FANG:    It's morning, little while ago Qiu Mei was there. One person was asking for two to three pieces.
>   ZHANG:       Oh.
>   QIU FANG:    That person was asking for two to three pieces. I don't what they discuss.
>   UF:          [Background conversation] He said that it's going to be tomorrow.
>   QIU FANG:    It's for two to three pieces. You can contact to Qiu Mei yourself.
>   ZHANG:       Uhm, okay, okay.
>   QIU FANG:    On the normal ones it's three hundred right?
>   ZHANG:       [Voices overlap] [UI]
>   QIU FANG:    Is it three hundred ? For normal...
>   ZHANG:       Yes, yes, yes.
>   QIU FANG:    Is it $300?
>   ZHANG:       It's three hundred.

81.     Based on the above, I believe that ZHANG was asking QIU FANG if anyone had come into China Gourmet to conduct a money exchange, and QIU FANG confirmed that ZENG had discussed a $20,000-$30,000 (2-3 pieces) transaction with a customer earlier that morning.  I believe that ZHANG then sought to confirm that QIU FANG was still charging the proper fee for such currency exchanges, at $300 per $10,000 exchanged.

82.     Approximately one minute after this discussion, investigators observed QIU FANG walk down the front steps of the Target Location 1 building with a white plastic bag. Investigators then observed QIU FANG walk directly to the driver's side window and hand the bag directly through the window to ZHANG before walking back into 23 Tyler Street. Based on the above

observations and intercepted call, I believe that QIU FANG delivered approximately $40,000 to ZHANG in the plastic bag, which likely constitute proceeds and/or facilitating property of the ongoing unlicensed money transmitting business.

83.    Based on these and dozens of other similar calls, I believe ZHANG, ZENG, and QIU FANG work at/own China Gourmet and operate an unlicensed money transmitting business from this location, with the cash proceeds and facilitating property being stored "upstairs" in Target Location 1.

**Bulk Cash Drug Proceeds Deliveries**
***(ZENG, ZHANG, DA, XIAN RONG, WEI QING, QIU FANG)***

84.    To facilitate ZENG and ZHANG's active money transmitting business, and in furtherance of the Target Subjects' money laundering activities, the Target Subjects are regularly involved in the delivery, receipt, and transfer of large quantities of bulk cash.  As discussed above, these incoming deliveries if bulk cash (like those from LIU) are believed to constitute and/or include drug and other illicit proceeds which, in turn, fuel the money transmissions by providing access to USD to customers.

85.    As detailed below, investigators also believe DA, WEI QING, XIAN RONG, and QIU FANG are actively involved in coordinating and transporting bulk cash suspected drug proceeds from New York back to Target Location 1 to facilitate this scheme.

*March 3, 2022: WEI QING Stopped with $250,000+ in Suspected Drug Proceeds*

86.    On the morning of March 3, 2022, GPS data for WEI QING's vehicle indicated that it had departed WEI QING's home (Target Location 3) and was traveling westbound on I-90, in the direction of New York.

87.     At approximately 11:47 a.m., ZENG received a call from an as-yet-unidentified female using telephone number 917-287-6278 (UF6278), who asked if ZENG's brother (WEI QING) was "coming to pick up."  ZENG stated that he "already went down that way to pick up some merchandise," and that he would "put that thing under the merchandise."  Investigators believe ZENG was explaining to UF6278 that her brother WEI QING was already traveling to New York to pick up some type of merchandise and that he was likely also retrieving a large quantity of bulk cash, which he was planning to secrete "under" the other merchandise.

88.     At approximately 2:22 p.m., GPS data indicated that WEI QING's vehicle stopped in the area of 28 Forsyth Street, in New York, New York.  At approximately 2:31 p.m., the vehicle drove to 288 Grand Street in New York, New York, where it remained for over an hour.

89.     At approximately 3:30 p.m., UF6278 called ZENG on TT3 and told her that ZENG's brother "took 252" and directed ZENG to wire the money.  Investigators believe UF6278 confirmed that WEI QING picked up $252,000 in New York on behalf of ZENG, and that ZENG should then wire the equivalent to complete the transaction.

90.     At approximately 3:36 p.m., GPS data indicated that WEI QING's vehicle departed 288 Grand Street and headed back in the direction of Boston.  Based on this timing, investigators believe WEI QING retrieved the $252,000 from 288 Grand Street in New York.

91.     At approximately 7:38 p.m., ZENG called WEI QING's Phone from TT3.  WEI QING told ZENG that he would be there (likely referring to Boston) around 9:00 p.m.  ZENG told WEI QING to be careful driving, and they agreed that it would be best for WEI QING to bring the "stuff" (believed to be the $252,000 in bulk cash) back to the China Gourmet restaurant.  As throughout this investigation, investigators believe the Target Subjects use "China Gourmet" as

the generic term for their restaurant and office space at 23 Tyler Street, including Target Location 1.

92.     At approximately 9:00 p.m., investigators executed a motor vehicle stop of WEI QING's vehicle as he drove on I-90, near the Massachusetts State Police Weston Barracks.  Based on the intercepted communications and the investigation to date, investigators searched WEI QING's vehicle and located a large quantity of frozen seafood and meats.  Inside a box of frozen meat, investigators located a plastic bag hidden underneath the meat.  Inside the plastic bag, investigators located over $250,000 in cash.

93.     Notably, some of the bills appeared to be stained with dye.  Based on my training and experience, I know that banks often include dye packs with cash that is stolen during bank robberies as a way to permanently mark stolen cash.  Based on these observations, I believe some of the bulk cash in WEI QING's vehicle may have been stolen.

94.     WEI QING denied knowledge or ownership of the cash located in his vehicle.

95.     In addition to the approximately $250,000 in cash, investigators located various bank documents, as well as receipts from "George Meat Market Inc." at 288 Grand Street, New York, New York, and from 28 Forsyth Street, New York, New York.  As noted above, these are the same addresses where the GPS tracking data placed WEI QING's vehicle earlier that day.  As such, investigators believe WEI QING retrieved the approximately $250,000 in bulk cash from George Meat Market.  Investigators seized the bulk currency and paperwork, as well as WEI QING's Phone.  Investigators removed the GPS from WEI QING's vehicle and then released WEI QING.

96.     Based on the investigation to date and the intercepted communications, I believe WEI QING traveled to New York on March 3, 2022, to retrieve the approximately $250,000 on

behalf of ZENG, and that WEI QING was *en route* to Boston to deliver the funds to ZENG at China Gourmet/Target Location 1 at the time he was stopped. I further believe WEI QING retrieved the bulk cash from George Meat Market located at 288 Grand Street in New York.

97. After WEI QING was released, at approximately 9:54 p.m., investigators observed WEI QING's vehicle drive down Tyler Street in Boston, near China Gourmet/Target Location 1. At approximately 10:03 p.m., investigators intercepted a call between XIAN RONG and ZENG in which XIAN RONG suggested he was with WEI QING, whose phone was not working, and said that they needed to see ZENG. I believe WEI QING located XIAN RONG in Chinatown and told him about the car stop, and that XIAN RONG used his own cellphone to call ZENG because WEI QING's phone had been seized by investigators. Based on the investigation to date, I believe WEI QING traveled to Chinatown to find one or more of the Targets Subjects to discuss the seizure of the $250,000 because they all work together to commit the Target Offenses, and because the $250,000 was being transported by WEI QING to ZENG, in furtherance of the Target Offenses.

98. Investigators later reviewed open source data from the New York Department of State's corporate database and determined that the chief executive officer for George Meat Market is Kwok Ng. As set forth above, in the marijuana background, investigators are familiar with Ng because he was stopped on December 8, 2021, with 30 pounds of marijuana in a van, shortly after he was observed delivering 20-25 large boxes full of suspected marijuana to the Needham Stash House, where, just five days later, investigators located a total of around 342 pounds of marijuana.

99. Investigators also reviewed Ng's criminal history and observed that he has a history of prior marijuana arrests. For example, Ng was arrested in October 2021 in Benton County, Oregon, at an illegal indoor marijuana grow house. He was also arrested in February 2018 in the

area of Seattle, Washington, in relation to a large-scale Chinese marijuana cultivation and distribution operation.

100. Based on the above, and the investigation to date, investigators believe Ng is a large-scale marijuana trafficker who worked with many others to distribute marijuana. Based on the seizure of $250,000 from WEI QING hidden inside a box of frozen meat from Ng's George Meat Market, investigators believe some of the $250,000 in bulk cash represents marijuana proceeds. As discussed above, I also believe some of the bulk cash may have been stolen from a bank at some point, due to the dye on the cash.

101. As such, investigators believe WEI QING, ZENG, and others (including Ng and UF6278) worked together to facilitate a $250,000 bulk cash money laundering transaction in New York, and arranged for the money to be delivered to ZENG at or near Target Location 1, all in furtherance of the Target Offenses.

*December 2021: WEI QING, DA, and ZENG Facilitate $100,000 Pickup*

102. The bulk cash pickup conducted by WEI QING and ZENG in March 2022 was not the first time the Target Subjects had engaged in this type of n activity. During the course of the investigation and wiretap, investigators determined that WEI QING and XIAN RONG both made regular trips to New York to facilitate these types of transactions, and that DA helped coordinate several of these deals. Based on the seizure of over $250,000 in suspected drug proceeds in March 2022, I believe that these transactions also involved bulk cash drug and other illicit proceeds. This belief was corroborated when, as described below, DA was interviewed in April 2022 and explained that the cash retrieved in New York was "not all…drug money," and that some of the money was also proceeds from COVID relief fraud.

103.     On December 8, 2021, beginning at approximately 7:30 p.m., and continuing into December 9, 2021, ZENG used TT3 to exchange a series of calls with DA.  First, ZENG asked DA if he could "line up 10 or 11 tonight for use tomorrow."  When DA expressed frustration at the short notice for ZENG's request, ZENG promised that she would not need to pick up the "stuff" until tomorrow, but could send the wire tonight, as long as DA could get her the bank accounts.  I believe ZENG asked DA if he could arrange for her to exchange $100,000-$110,000 ("10 or 11") worth of bulk cash that she would pick up the following day in exchange for the equivalent to be wired into various bank accounts.

104.     Approximately an hour later, at 8:29 p.m., DA called ZENG's TT3 and told her that his contact preferred to exchange "whole amounts of 10, 20, or 30," which I believe to be a reference to round dollar amounts such as $100,000 ("10"), $200,000 ("20"), or $300,000 ("30").  ZENG confirmed that she could pick up "10" the following day and would wire the money that evening if DA sent her the bank account information.

105.     On December 9, 2021, at approximately 11:41 a.m., ZENG called DA and explained that her brother, WEI QING, would pick the money up from DA.  Shortly thereafter, at approximately 11:45 a.m., ZENG used TT3 to call WEI QING Phone and asked about his itinerary for the day.  In summary, WEI QING explained that he would be making two stops on Long Island and two stops in Brooklyn, New York for merchandise deliveries.  ZENG asked WEI QING to stop by Flushing, New York to pick up "10 units," believed to be the $100,000 ZENG coordinated with DA.  WEI QING stated that he was concerned about getting pulled over on the highway like he had been before.  ZENG then explained that she would contact a third party named "Wang Jian" for an additional pickup.  ZENG told WEI QING that Wang Jian had more than "40 units" confiscated by plainclothes police last time when he was exchanging large bills for small bills.

ZENG stated that there had been multiple incidents of police confiscations in New York.  WEI QING replied that it was safer to stay with the smaller numbers because there were too many informants.  I believe ZENG and WEI QING were discussing the fact that they knew their activities were illegal (and/or that the bulk cash represented illicit proceeds) because they wanted to be careful so that the police did not seize the bulk cash they would be transporting.

106.    Later on December 9, 2021, at approximately 2:34 p.m., ZENG called DA from TT3 and asked if he had made contact.  DA stated that the money would not be ready for ZENG until that night because "the vans run at night."  ZENG told DA that she thought they agreed on a pickup during the day because her brother (WEI QING) had previously been pulled over on I-90 at night, and ZENG believed there would be many cops on the highway at night.  ZENG explained to DA that she did not want her brother to get busted with the money on him at night.  DA then agreed to call to see if they could conduct the transaction earlier.

107.    Based on the above, investigators believe ZENG was coordinating a bulk cash pickup in New York to be conducted by her brother, WEI QING, from DA (or DA's associate), and I further believe WEI QING was planning to bring the bulk cash back to the Boston area to further ZENG's ongoing money laundering and/or unlicensed money transmitting business.  Investigators believe the bulk cash being transported by WEI QING represented illicit proceeds and/or constituted illegal money laundering or money transmitting activity because ZENG did not want WEI QING to be "busted" by law enforcement while driving a vehicle to transport the funds.

108.    The following day, December 10, 2021, at approximately 11:52 a.m., ZENG used TT3 to call ZHANG on TT4.  During the call, ZHANG told ZENG, "I may need your brother to go up on Sunday, delivering the merchandise."  ZENG responded, "Okay, okay. No problem. My brother told me that he is very poor, and he doesn't have any money.  Do you understand?  He

wants…" ZHANG told ZENG, "Just give him another $10,000." I believe ZHANG told ZENG that he needed WEI QING to make deliveries of either bulk cash or electronic goods in exchange for a $10,000 payment.

*February 2022:XIAN RONG, ZHANG, ZENG, DA, and QIU FANG Facilitated $140,000 Pickup*

109. WEI QING was not the only Target Subject to retrieve bulk cash from New York. As detailed below, XIAN RONG also made similar trips to New York, including in February 2022.

110. On February 17, 2022, license plate readers in New York indicated that XIAN RONG's vehicle arrived near New York City late in the evening. On February 18, 2022, ZHANG used TT4 to call XIAN RONG Phone at around 4:36 p.m., and asked if he was returning home from New York that evening. XIAN RONG responded yes, and ZHANG asked him to bring $20,000 in cash back for ZHANG. Despite XIAN RONG's statement that he would be returning that evening, it appears XIAN RONG remained in New York until the following day because, on February 19, 2022, at approximately 6:58 p.m., ZHANG received an incoming call from XIAN RONG stating that he was "in Flushing." ZHANG directed XIAN RONG to contact "Kenny" (an alias for DA)[5] to pick up the cash.

111. Over the course of the next few hours, ZHANG exchanged multiple calls with DA to coordinate the money pickup in New York. At around 7:15 p.m., the men discussed that the money was not yet ready to be collected, and ZHANG said that "he" (referring to XIAN RONG) could wait for the delivery. At approximately 8:12 p.m., ZHANG reported to DA that "Ah Dee" (believed to be a nickname for XIAN RONG) was still waiting in Flushing and that ZHANG could wire the money within an hour after the delivery. Finally, at approximately 9:30 p.m., DA confirmed that the money was ready and that it would be a total of "fifteen units," which

---

[5] In several other intercepted calls, ZHANG has referred to DA as "Kenny."

investigators believe refers to $150,000. ZHANG stated that he could "take ten" and that RMB would be wired to the accounts in China. Investigators believe ZHANG told DA that he would wire $100,000 to accounts in China in exchange for the $100,000 bulk cash to be picked up by XIAN RONG.

112.    The following day, February 20, 2022, at approximately 1:32 p.m., ZENG called XIAN RONG Phone from TT3 and directed XIAN RONG to "drop off everything to big sister in China Gourmet and then someone else is going to pick up the stuff." Investigators believe ZENG was directing XIAN RONG to deliver the bulk cash he had picked up in New York to QIU FANG (believed to be ZENG's sister) at China Gourmet. As before, I believe the Target Subjects refer to China Gourmet as the landmark in a general sense, but I believe the money likely went to the second floor, into Target Location 1.

113.    ZENG then used TT2 to call ZHANG on TT4 at approximately 2:22 p.m. ZHANG asked if "Ah Dee" (XIAN RONG) "arrived with the stuff." ZENG confirmed that Ah Dee had arrived back in the Boston area and that she told him to "bring it over to the restaurant." ZENG told ZHANG that the money was "loose," and that they should count it at the restaurant, but that it should be "14 pieces" or $140,000. Investigators believe ZHANG was asking ZENG if XIAN RONG had returned with the bulk cash from New York, and that ZENG confirmed that she told XIAN RONG to bring the cash to China Gourmet. Investigators further believe ZENG told ZHANG that it would be $140,000 in loose cash instead of being fully bundled.

114.    At approximately 2:59 p.m., investigators viewed pole camera surveillance from outside China Gourmet and observed XIAN RONG pull up outside the restaurant. A male walked out of China Gourmet and retrieved a white shopping bag from the trunk of XIAN RONG's vehicle, before returning inside the Target Location 1 building. XIAN RONG then drove away from the area.

115.     Shortly thereafter, at approximately 3:08 p.m., ZENG used TT3 to call QIU FANG. QIU FANG reported that she was counting the money and would send photos to ZENG.  The two women discussed that $30,000 would be placed in one bag for a customer to pick up, and that ZENG would pick up $10,000 in large bills herself.

116.     At approximately 3:13 p.m., investigators observed ZENG pull her vehicle into the parking lot next to China Gourmet.  ZENG then called QIU FANG to report that she had arrived, and QIU FANG said that she would bring the money out to ZENG.  At approximately 3:16 p.m., investigators viewing pole camera surveillance observed QIU FANG walk out of the Target Location 1 building carrying a black medium-sized bag, which she delivered to ZENG through the driver's side window of ZENG's vehicle.  ZENG then drove away from the area.

117.     Based on all of the above, investigators believe XIAN RONG drove to China Gourmet/Target Location 1 to deliver the bag of bulk cash to QIU FANG (via the male who retrieved the bag).  Again, based on the investigation to date, including the seizure of suspected drug proceeds from WEI QING, investigators believe the bulk cash constituted proceeds from drug trafficking and/or COVID relief fraud.  Investigators believe QIU FANG then counted the money and packaged the money for delivery to various customers of ZENG's unlicensed money transmitting and/or money laundering operation, and that some of the money was packaged for ZENG personally.  Based on QIU FANG and ZHANG's retrieval of the bundled cash and money counter from within Target Location 1 during the undercover transactions described above, investigators believe QIU FANG likely counted and/or stored the money delivered by XIAN RONG inside Target Location 1.   Investigators believe QIU FANG then delivered an amount of cash—likely around $10,000— to ZENG.

118.     Almost immediately after departing with the bag of suspected cash, ZENG used TT3 to speak to ZHANG on TT4 twice to discuss the money that had been delivered by XIAN

RONG. ZENG reported that QIU FANG had counted the money and it was "two stacks" of $51,400 and $51,460, and "then ten cards." Investigators believe XIAN RONG delivered nearly $103,000 in cash and then additional money in the form of 10 gift or money cards. As further detailed below, investigators have determined that ZHANG, DA, and other Target Subjects are also involved in a trade-based money laundering scheme involving the use of stolen American Express gift cards. As such, I believe XIAN RONG facilitated that money laundering scheme by delivering these gift cards along with the bulk cash.

*Additional Trips to New York*

119. In addition to the suspected bulk cash transactions discussed above, investigators have intercepted several other communications between the Target Subjects in which they discuss similar trips to New York.

120. For example, on February 23, 2022, ZHANG used TT4 to call WEI QING Phone. ZHANG directed WEI QING to go to either Brooklyn or Flushing to pick up for ZHANG and told him that the "stuff" would be ready by noon. WEI QING asked if he would be picking up from the same person as the past. ZHANG responded that it was "Kenny's friend" and that he believed it was the same person as before. Based on the investigation to date, investigators believe ZHANG directed WEI QING to pick up additional bulk cash drug proceeds in either Flushing or Brooklyn, New York, from a friend of DA's, which would be brought back to ZHANG and/or ZENG in Boston in furtherance of the Target Offenses.

121. On February 28, 2022, ZENG called WEI QING from TT3. During the call, WEI QING complained to ZENG that ZHANG was ordering him to drive back and forth between Flushing and Brooklyn to pick up cash and cards. Investigators believe WEI QING was complaining about conducting the bulk cash money pickups like the transactions discussed above, and that WEI QING was also involved in delivering stolen gift cards from New York to ZHANG

in Boston. Investigators further believe this call establishes that WEI QING is aware of the nature and type of goods he is transporting.

122. Based on all of the above, I believe ZENG and ZHANG run a large-scale unlicensed money transmitting business and that they launder hundreds of thousands—if not millions—of dollars in illicit proceeds, including drug proceeds through this money transmitting business. I further believe that DA, QIU FANG, WEI QING, and XIAN RONG all actively participate in this scheme, including by coordinating these transactions and/or transporting, counting, and delivering bulk cash drug proceeds between New York and Boston.

**Trade-Based Money Laundering with Stolen Gift Cards and Apple Products**
*(ZHANG, ZENG, DA, FENG)*

123. As noted above, ZHANG is listed as the registered owner of a business called Wonderful Trading/Wonderful Electronics, which purports to be engaged in electronics sales. Based on the investigation to date, I believe ZHANG, ZENG, FENG, DA, and others work closely together on a trade-based money laundering scheme involving Apple electronics products. To date, investigators have identified at least one source of the illicit proceeds fueling this scheme: stolen American Express gift cards. Based on the investigation to date, however, investigators suspect that ZHANG and ZENG are also laundering marijuana proceeds and/or proceeds from their unlicensed money transmitting business through this complex scheme.

124. As set forth below, investigators believe DA and ZHANG are directly involved in obtaining stolen and/or fraudulent American Express gift cards, in bulk, from New York and other sources. These include gift cards like those delivered by XIAN RONG alongside bulk cash retrieved from New York in February 2022, and also electronic gift cards shared via encrypted messaging applications. Once in possession of the illegal gift cards, ZHANG, DA, and a network of other "shoppers" purchase Apple products online and/or in store using these illicit funds. In

particular, the Target Subjects often purchase Apple gift cards with the stolen and/or fraudulent American Express gift cards. I believe the purpose of this activity is to "clean" the illicit proceeds and hide the true nature and source of those funds. I also believe the purpose of this activity to is quickly remove and secure the value from the illicit gift cards before American Express can freeze the stolen account and/or before the rightful owner can lawfully use the funds on the card. Once in possession of "clean" Apple gift cards, ZHANG, DA, and the shoppers use multiple Apple gift cards at a time to purchase Apple products, including iPads, laptops, and iPhones. ZHANG, ZENG, FENG, and others then work together to ship these goods overseas, including to Dubai, United Arab Emirates ("UAE"). Once in Dubai, the devices are believed to be sold to countries in which Apple devices are otherwise not lawfully available or are prohibitively expensive. The funds from the international sale of these devices are then funneled back to the United States, including through wire transfers to ZHANG, FENG, and others. I believe the purpose of this trade-based money laundering scheme is to hide the true nature and source of the illicit funds and secure "clean" funds on the back side.

*ZHANG and DA Source and Use Stolen/Fraudulent Gift Cards to Purchase Apple Products*

125. Interceptions over TT4 confirmed that DA works closely with ZHANG to purchase Apple gift cards and Apple devices as part of this trade-based money laundering scheme. For example, on February 10, 2022, DA called ZHANG to request that ZHANG wire DA money so that he could purchase iPhone 13s and "cards" (believed to be Apple gift cards used, in turn, to purchase Apple devices). On February 21, 2022, ZHANG used TT4 to call DA to ask if DA needed cash. DA confirmed that he may need a "few more units," (referring to quantities of $10,000 per unit). DA told ZHANG that he was making a few hundred dollars a day in profit shopping for devices in Massachusetts, and that if they purchased over $100,000-worth of devices

their profit could be over $1,000.  DA and ZHANG then discussed that they could make their business more profitable if they recruited teams of shoppers to go out and purchase more devices.

126.  On February 23, 2022, DA and ZHANG had a lengthy conversation about purchasing Apple devices with gift cards.  DA said that he had $80,000-$90,000 worth of gift cards.  ZHANG asked DA to bring those cards over to him so that he could divide them up and have "his people" (the shoppers) go wait in line for Apple devices.  DA added that he had purchased six devices himself that day.

127.  The following day, February 24, 2022, investigators utilized court-authorized precise location information for DA Phone to locate him at an Apple store in the South Shore mall in Braintree, Massachusetts, where they initiated physical surveillance.  There, investigators observed DA pick up six more Apple iPhones.  Investigators obtained the records from the Apple store which confirmed that DA had purchased the six devices ahead of time and had paid electronically.

128.  Similar observations were made four days later on February 28, 2022, when investigators conducted surveillance at the same Apple store in the South Shore mall in Braintree.  At approximately 4:41 p.m., investigators observed DA inside the Apple store with two other Asian individuals, a male and a female.  Investigators spoke to employees at the Apple store who noted that they had seen the female on prior occasions and that she frequently came into the Apple store to exchange Apple phones for gift cards or to purchase Apple gift cards.  By approximately 5:06 p.m., the male and female had departed, but DA remained at the mall.  At around 5:23 p.m., DA reentered the Apple Store and attempted to conduct a purchase, but his payment was declined.  Shortly after 6:00 p.m., DA returned to the Apple store and was apparently successful in purchasing $8,000 in Apple gift cards (according to an Apple employee).  At approximately 6:12

p.m., investigators observed DA approach a different employee inside the Apple store to make an additional purchase. And at 6:20 p.m., investigators observed DA approach yet another Apple employee to make a purchase. Investigators learned from Apple employees that many of DA's payment methods were declined when he was trying to make these purchases. Based on DA's repeated attempts to purchase Apple products from different employees with payment methods that were being declined, investigators believe DA was using stolen or otherwise illegitimate payment methods to conduct these transactions, and that they were being declined because the payment sources had been flagged or frozen.

129.     On March 2, 2022, investigators again reviewed precise location information for DA Phone and observed that the device was yet again located in the area of the South Shore mall in Braintree. Investigators initiated physical surveillance of the Apple store in the mall and, at approximately 2:34 p.m., observed DA inside the Apple store with several other unknown Asian individuals. Investigators approached DA, as well as three of the other Asian individuals who appeared to be engaged in similar purchasing activity. These individuals were found in possession of various Apple products, including gift cards, cell phones, and receipts from purchases.

130.     Investigators approached DA, who was found in possession of numerous Apple gift cards worth an estimated $60,000, several newly-purchased cell phones, numerous receipts for Apple Store transactions, and six active, powered-on cell phones. DA agreed to speak with investigators but provided mostly false information about his activities. For example, DA claimed that he purchased cell phones and Apple gift cards with his own money that he saved up from working at a Chinese food restaurant but admitted that he had not worked at the restaurant in several years. DA also had a receipt for an order of Apple products in ZHANG's name. DA claimed, however, that he made up Shi Rong ZHANG's name, and that he was not working with

anyone else (including ZHANG) to purchase Apple products. Based on the investigation to date—including the numerous intercepted conversations between ZHANG and DA—investigators believe DA's statements about not knowing ZHANG and purchasing the Apple products with his own earnings were untruthful.

131.    Certain other of DA's statements appeared, based on the investigation to date, to be truthful (at least in part). For example, DA claimed to purchase $30,000-$50,000 worth of Apple gift cards per day, as well as six to seven Apple phones. This volume is consistent with the observations made by investigators discussed above. DA also claimed to sell the phones to people in the UAE for a profit of $10 per device. Over the course of the investigation, as described below, investigators have observed ZHANG shipping numerous packages to Dubai, and have intercepted conversations with ZHANG and others in which he discussed shipping Apple products to Dubai. Finally, DA originally claimed that he sold the Apple gift cards, but then later changed his response to admit that he used the gift cards to purchase more Apple devices to sell to the UAE. Based on the numerous receipts obtained from DA, which showed purchases of Apple phones paid for by Apple gift cards, investigators believe this latter answer was likely more accurate.

132.    Investigators questioned DA about why he was using six different active phones. DA showed investigators that five of the devices were not connected to cellular services, but rather only being used as "digital wallets" and were only connected to Wi-Fi. DA showed investigators the Apple wallets on these devices, which each contained around 20 prepaid American Express gift cards valued at $500 each. DA explained that he used these American Express gift cards to buy Apple gift cards. When asked why DA was using those numerous American Express gift cards as opposed to a credit or debit card to make these purchases, DA refused to answer and changed the subject. DA was released without charges, but investigators seized the gift cards.

133.     On April 13, 2022, investigators obtained a warrant to seize and search DA Phone. On April 27, 2022, precise location information for DA Phone indicated that the device was heading toward the Cambridgeside Mall in Cambridge, Massachusetts where investigators know an Apple store to be located.  Investigators initiated surveillance and approached DA at approximately 5:45 p.m., inside the Apple store in the mall.  Agents executed the search warrant and seized DA Phone, as well as multiple other iPhones DA was using exclusively to access Apple Wallets, which had been loaded with American Express gift cards.

134.     DA again agreed to speak with investigators and told them that he purchased the American Express gift cards through group chats on WeChat.  According to DA, he paid for the American Express gift cards at a discount in RMB, then the unknown individuals in the group chat sent DA the gift card numbers in the group chat.  Investigators asked DA why the American Express gift cards were being sold to him at a discount, but DA did not answer.  When asked if the American Express gift cards were stolen, DA took a long pause and responded, "Maybe," and explained that he knew a lot of the "gift card people" steal the gift cards but could not say for certain whether the cards he possessed in his Apple Wallets that day were stolen.  DA stated that he only buys Apple gift cards with the American Express gift cards, then he sells the Apple gift cards to three different people: Alan, Tony, and Mark.  Investigators know "Alan" or "Allen" to be ZHANG's alias. DA corroborated this identification when he identified "Alan" as previously living in Hanover, and recently moving to New Hampshire.  Investigators are aware—based on intercepted calls, surveillance, and public records, that ZHANG and ZENG recently moved from Hanover, Massachusetts to New Hampshire.

135.     DA also shared information about ZENG and ZHANG.  DA stated that he helped facilitate exchanges of U.S. dollars for RMB between ZENG/ZHANG and an individual in New

York.  DA stated that ZENG and ZHANG would wire RMB to the third party and then pick up the U.S. cash themselves (or via a runner) in New York.  In a WeChat group chat on DA Phone, investigators identified a group chat with "QM" (ZENG) and "Alan" (ZHANG) in which they provided DA with the telephone numbers for their "runners" who were set to pick up the cash in New York: WEI QING Phone and XIAN RONG Phone.  When asked about the source of the money in New York, DA responded that, "not all of the money is drug money" and that some of the money is "COVID money," which I believe refers to funds obtained through COVID relief fraud.  Investigators believe DA's statements were consistent with the bulk money pickups described above, involving WEI QING and XIAN RONG, and further believe this corroborates their belief that the funds being laundered include proceeds from drugs and/or fraud.

136.  Investigators obtained records from Apple and American Express based on the receipts and records obtained from DA over the course of the investigation.  These records indicate that DA used multiple American Express gift cards to purchase Apple gift cards, and that he and ZHANG used those Apple gift cards to purchase Apple phones and other devices.  Based on records from American Express related to the American Express gift cards shared in the WeChat group chat on DA Phone, investigators were able to contact the original purchasers of several of these American Express gift cards.  At least one of these individuals confirmed that she had been the victim of credit card fraud, and that her card was used to purchase $16,000 worth of American Express gift cards.  Based on this information, DA's statements about "gift card people" being involved in stealing cards, and the fact that DA admitted to obtaining the American Express gift cards at a discount, I believe the American Express gift cards used by DA represent proceeds of fraud and/or theft, and that DA and ZHANG are using these illicit proceeds to purchase the Apple

gift cards and, in turn, Apple devices, which are used to clean and/or facilitate their money laundering.

*Target Subjects' Knowledge of, and Involvement in, Trade-Based Money Laundering Scheme*

137. Investigators believe ZHANG, ZENG, and FENG are also involved in this trade-based money laundering scheme, and that they know the scheme is illegal. This was highlighted in the aftermath of March 2, 2022, when DA and the other "shoppers" were stopped by investigators in Braintree. Shortly after that incident, ZHANG began discussing the event over TT4. For example, at approximately 3:29 p.m. (less than an hour after DA and the three Asian men were approached outside the Apple store), a male using 617-774-9127 ("UM9127") called TT4 and warned ZHANG to "call his shoppers back" because "Chinese shoppers were taken in South Shore Mall." ZHANG said that he would "call [his] shoppers." Almost immediately after hanging up with UM9127, ZHANG called DA using Target Telephone 4. DA responded only that he was busy, and the call ended after approximately 17 seconds. Based on the timing of this call, investigators believe ZHANG was most concerned about DA being stopped by police because DA worked closely with ZHANG on this trade-based money laundering operation, but also believe that ZHANG supervised other "shoppers" who were out conducting the same illegal activity.

138. At approximately 3:37 p.m., a female using 646-595-9302 ("UF9302") called TT4 and reported that she was at the South Shore mall and that she knew the shoppers were stopped by the police. ZHANG told UF9302 to "tell all the people to abort purchases for the rest of the day" because "those shoppers who shopped with gift cards will have problems." ZHANG added that "shopping with the cards issued by Apple is okay." I believe ZHANG confirmed in this call that he was aware that the "gift cards" (such as the American Express gift cards) may be stolen or otherwise illegitimate and would therefore cause "problems," but that the Apple gift cards were

clean and therefore should not pose any issues for shoppers.

139. At approximately 4:51 p.m., ZHANG spoke again to UM9127 about DA and the other shoppers being stopped. UM9127 suggested that they should all stop shopping otherwise they "will be ambushed." UM9127 stated that he had to "destroy and discard all the cards and everything with all the receipts" when he got home. UM9217 explained that he had three telephones but was only using this x9217 number to speak to ZHANG, and that he uses other phones and WeChat to talk to other people because he was afraid of "being bugged." UM9217 said that he received a text message from one of the shoppers that they were leaving the scene. ZHANG asked, "If they get arrested, what will be the charges against them?" UM9217 responded that the government will trace the source of the cards and destination of the phones and may flip the shoppers into informants. ZHANG responded that he knows that he is "playing edge ball" (believed to mean engaging in risky/illegal activity) and wondered what kind of evidence could be used to indict him. UM9217 responded that the government "can get the evidence easily." Based on these interceptions, investigators believe UM9217 works closely with ZHANG to operate his trade-based money laundering operation, and that both men were aware that the "cards" being used to purchase Apple products were illegally obtained and/or represented illicit proceeds (hence why UM9217 had to "destroy and discard all the cards," because the government "will trace the source of the cards"). Investigators further believe ZHANG and UM9217 are both aware of the illegal nature of their activities because they are afraid of being "bugged," are considering what evidence might be used against them, and wondering what crimes they may be charged with.

140. Several days later, on March 7, 2022, ZHANG was still discussing the incident with a female using 617-792-2299 ("UF2299"). ZHANG told UF2299 that when the people were stopped, "only the legit Apple cards were taken." Again, investigators believe ZHANG

differentiated the "legit Apple cards" (which are clean because they obfuscate the illicit origin of the American Express gift cards), from the illegitimate American Express and other gift cards that DA and the other shoppers were using on their Apple wallets, which were not seized.

141.    ZENG, for her part, was also intercepted discussing the fact that the "shoppers" were stopped by police at the Apple store.  For example, on March 3, 2022 (the day after DA and the other shoppers were stopped), ZENG spoke to a female using number 815-566-7213 ("UF7213").  ZENG said she learned from her husband, ZHANG, that one of the shoppers lost $60,000, and that this same person shopped with "cards" and spent $70,000.  Based on the approximately $60,000 in Apple gift cards seized from DA, investigators believe ZENG was talking about DA here.  ZENG also told UF7213 that the police only stopped "card business people, not the device shoppers."  Investigators believe, based on the conversation, that ZENG is aware of the illegitimate gift cards ("card business") being used by ZHANG and DA's trade-based money laundering operation.  Later that same day, ZENG continued her discussions with UF7213 and noted that all of DA's cards were confiscated.  UF7213 suggested that DA could sue the police for seizing the cards without justification, to which ZENG responded, "How can you go sue them, when you, yourself is doing something illegal?"

142.    Several days later, on March 5, 2022, ZENG continued to discuss the recent law enforcement activity with UF7213.  ZENG and UF7213 speculated about whether certain individuals were informants for the government.  UF7213 speculated that one of the "shoppers" might be an informant.  ZENG stated that "Yang MeiMei" (believed to be DA[6]) knows a lot about ZHANG, so if Yang MeiMei was the informant, they would have "more serious problems."  ZENG

---

[6] Based on the interceptions during the course of this investigation—including a conversation on March 4, 2022, in which ZENG told a third party that "Yang MeiMei was arrested and lost $60,000 in cards"— investigators believe ZENG refers to DA as "Yang MeiMei."

and UF7213 also speculated about the origin of the investigation, and UF7213 suggested that the investigation may have stemmed from "other investigations against fraudulent credit card rings."

143.    Based on these conversations and the investigation to date, investigators believe ZENG is aware of the illegal nature of DA and ZHANG's money laundering operation.

*ZENG and DA Work with ZHANG to Transport and Store Apple Products*

144.    Once large quantities of Apple products are obtained, investigators believe DA and ZENG are personally involved in moving and storing large quantities of these electronics with ZHANG.

145.    For example, on December 13, 2021, ZENG used TT2 to call an unknown male at 603-867-6886 ("UM6886").  ZENG told UM6886 that she would meet him in about an hour and asked how many "goods" there were.  UM6886 responded, "Er…just 13 computers."  Later on this same date, ZENG discussed transporting these computers with ZHANG and FENG.  At approximately 1:46 p.m., ZHANG instructed ZENG, that she "need[ed] to take the van" and should "only take those computers."  Approximately a minute later, ZENG called and told ZHANG that she was going to call FENG to bring his pickup truck to help with picking up the goods.  ZHANG responded that he did not believe the truck was big enough because it had a cover on the flat bad of the truck.  Approximately two minutes later, ZENG used TT3 to call FENG Phone:

| | |
|---|---|
| ZENG: | Hey, can you fit 200 something computers in your car? |
| FENG: | 200ish...just try to fit and see, it's alright, just try to fit them in. If we really can't fit then there's nothing we can do. Try our best. |
| ZENG: | No, he said your car can only fit like my Benz. |
| FENG: | That's ok. |
| ZENG: | It might fit less than mine. |
| FENG: | Well that's up to you, but how is it possible my pickup truck fits less than yours? |
| ZENG: | Yeah. |
| FENG: | Every time we go down my car fits the most! |

146. I believe ZENG asked FENG if he could fit 200 computers in his pickup truck. FENG responded that he could fit around 200 computers and added that his truck should be able to fit more computers than ZENG's Mercedes. I also believe FENG discussed that he and ZENG had made previous large pickups of electronics. Based on the above, I believe ZENG and FENG worked together to transport hundreds of electronics as part of the trade-based money laundering operation.

147. Later that night, ZENG used TT3 to call TT4 to report back to ZHANG. ZENG stated that FENG was going to deliver "157 pieces" to ZHANG at their home. ZENG added that they ran out of room and could not fit another 50 "pieces" or more iPads, so she would have to deal with that tomorrow. I believe ZENG was confirming that FENG had retrieved 157 computers from UM6886 and was going to deliver those to ZHANG at ZHANG/ZENG's then residence in Hanover, Massachusetts. I also believe ZENG stated that she would need to pick up the remaining computers and iPads the following day because they could not fit everything in their vehicle. Based on this conversation, I believe ZENG and ZHANG store the Apple products to facilitate the trade-based money laundering scheme in their primary residence and that, now that they have moved from Hanover to New Hampshire, they likely store these devices in their new residence.

148. The following day, December 14, 2021, at approximately 11:58 a.m., ZENG called UM6886 again from TT2:

| | |
|---|---|
| ZENG: | Nen Sir [PH], have the goods arrived? |
| UM6886: | Arrived, about 200 something...200 something...225 plus 34...so 250 something units. |
| ZENG: | 250 something iPad? |
| UM6886: | Yes. |
| ZENG: | Are the measurements big? |
| UM6886: | Measurements are big, they are computers. |
| ZENG: | Are they the same computer? MacBooks? |
| UM6886: | Err...yes. Same as the ones you took yesterday. |

| ZENG: | 200 something units? Are they all ours? |
|---|---|
| UM6886: | Yes they are all yours. |
| ZENG: | Oh...then I might need to drive two cars there today. |
| UM6886: | You can't drive a truck? |
| ZENG: | The truck from yesterday we were only able to fit 157 in there. |
| UM6886: | Then that's not going to work. |
| ZENG: | We stuffed it to the max!... |

149.    I believe ZENG and UM6886 were discussing the logistics of ZENG picking up the remaining Apple computers on behalf of ZHANG.  I believe UM6886 stated that he had another 250 units and ZENG responded that she would not be able to fit those all in her car.

150.    Shortly thereafter, at around 12:15 p.m., ZHANG used TT4 to call ZENG on TT3. ZENG told ZHANG that there were "two hundred plus" items to be picked up.  ZHANG confirmed, "they are not MacBooks but iPads."  I believe ZENG and ZHANG were confirming that ZENG needed to pick up the 200-250 iPads from UM6886.

*ZHANG and FENG Export Apple Products to Dubai*

151.    After the Apple products are obtained, transported, and stored, investigators believe ZHANG and FENG ship these products to Dubai, UAE.

152.    For example, on February 11, 2022, ZHANG called FedEx to track a package and provided the tracking number during the call.  Investigators reviewed tracking information for that package and determined that it was one of eight packages shipped from Hollis, New Hampshire to Dubai, UAE.  In a subsequent call on February 14, 2022, to an unknown male using 613-513-0306 ("UM0306"), ZHANG discussed that he was having an issue with a FedEx package.  ZHANG stated that he "sent eight boxes on Thursday, and then I was at Boston Airport around 9:00/9:30. The next day I have a feeling something's wrong with the second box.  I happen to have shipment again on Friday, so I went there again and asked.  Everything else was about to arrive [in] Dubai, but only this one is still at East Boston….This box only has 44 Apple watches [inside]."  Based on

these interceptions, investigators believe ZHANG shipped multiple boxes of bulk Apple products (including at least 44 Apple watches), from the U.S. to Dubai, as part of his trade-based money laundering scheme.

153.  Investigators have reviewed numerous financial records for ZHANG and his various companies and have identified large incoming wire transfers from Dubai-based companies, including Action Logistics FZE, which accounted for over $4.5 million in deposits into ZHANG's business account for Wonderful Electronics at Santander Bank between March and July 2021 alone. Action Logistics FZE is a Dubai-based "freight forwarder," which according to public source information, specializes in clearing mobile phones and other electronics.  Based on my training and experience, I understand that logistics companies such as Action Logistics are often the first stop for stolen and/or fraudulently obtained electronics being shipped internationally.

154.  Based on the investigation to date, I believe the wires from Action Logistics FZE reflect payments to ZHANG for Apple products shipped by ZHANG to Dubai, all in furtherance of the trade-based money laundering scheme.

155.  This Wonderful Electronics bank account at Santander Bank shows numerous other suspicious transactions, which investigators believe are indicative of ZHANG using this account to launder the proceeds from his illicit Apple trade-based money laundering scheme.  In the approximately four months it was open, this account had nearly $26 million (mostly in large wire transfers) flow through it. For example:

> a.  Approximately $17 million dollars were received via wire transfers from Rocketdrop LLC.  According to public source information, Rocketdrop LLC is an electronics company in Salem, New Hampshire with annual revenue in the tens of millions of dollars.  Financial records for Rocketdrop, however, show over $965

million in total activity between just January 2020 and July 2021. Investigators are continuing to review financial records but have not yet developed an explanation for this large discrepancy. Nor have financial records explained why Rocketdrop sent approximately $17 million to Wonderful Electronics when the financial records would suggest that money should flow in the opposite direction: specifically, investigators would have expected to see payments from a seemingly smaller company (Wonderful Electronics) to a larger company (Rocketdrop) for electronics inventory, not the reverse direction, as the records indicate. Based on this flow of money, and the investigation to date, I believe ZHANG is involved in laundering money between Wonderful Electronics and Rocketdrop.

b. Approximately $190,000 in deposits were made in the form of checks from various local business entities, for seemingly illogical goods and services, including: a $52,760 check from Wong Development LLC, dated May 3, 2021, with a notation that the payment was "for construction;" a $52,000 check from 110 Littleton LLC, also dated May 3, 2021, with a notation that the check was "for remodeling;" and a $45,240 check from Milford Mandarin restaurant, also dated May 3, 2021, "for borrow." Neither the interceptions to date nor the financial investigation has provided a legitimate reason to explain why various business entities made these large payments to a putative electronics reseller (Wonderful Electronics) for "construction" or "remodeling" services. Based on the investigation to date, I believe ZHANG used this account to launder and/or transmit money by accepting putative "business checks," so that the transactions would appear, superficially, to be legitimate business transactions.

156. Santander Bank closed this Wonderful Electronics account in September 2021. Shortly thereafter, in October 2021, FENG opened a bank account at JP Morgan Chase for a new company, Best Offer Trading Inc. FENG created and registered Best Offer Trading on September 27, 2021, and listed its business address as Target Location 1. Although FENG listed only himself as owner, based on the investigation to date, investigators believe FENG created Best Offer Trading as a shell corporation to take the place of Wonderful Electronics, after Santander shut down ZHANG's account. I believe the purpose of FENG creating this company and the associated account was to allow FENG, ZHANG, ZENG, and others to continue their money laundering.

157. The transactions in the Best Offer bank account further suggest that this account was the successor pass-through account to Wonderful Electronics. To start, the remaining balance of around $110,000 from a Wonderful Trading/Wonderful Electronics account was rolled over into this Best Offer account in November 2021. As with the Wonderful Electronics account, Action Logistics and Rocketdrop were the largest sources of incoming funds into FENG's Best Offer Trading account, with wires totaling over $3.4 million and $390,000, respectively, between October 2021 and April 2022. Based on the investigation to date, I believe FENG is facilitating the trade-based money laundering operation with ZHANG by creating a new business and associated bank account(s) to accept the proceeds from the scheme.

158. During his intercepted communications, ZHANG also made the explicit connection between Best Offer and the Apple product money laundering scheme. On February 18, 2022, ZHANG asked FENG if he could apply for a company credit card with Best Offer. ZHANG suggested that he wanted to apply for an American Express credit card because "they have a very high limit," which would be important, "especially for us doing cell phones." Based on this conversation, I believe ZHANG wanted to obtain a Best Offer credit card to facilitate the trade-

based money laundering scheme.

159.    Intercepted communications also suggest that ZHANG, FENG, and ZENG used the Best Offer account much like their Wonderful Trading account—to accept "business checks" to facilitate their money transmitting business.   For example, on March 1, 2022, ZENG called ZHANG and told him that people were looking to "exchange checks" and asked ZHANG which bank account he wanted the checks to go into.   ZHANG told ZENG to have the person "give [the checks to] that Vincent Chase account."   ZENG asked if that company was "Best Offer," and ZHANG confirmed.   I believe ZHANG told ZENG to deposit fake business checks being written by money transmitting customers into FENG's Best Offer Trading account at JP Morgan Chase.

160.    In another discussion on February 24, 2022, ZHANG and FENG discussed using their various accounts—including Best Offer Trading instead of Wonderful Electronics—to "exchange" incoming business checks for outgoing wires or checks.   FENG told ZHANG about a third party who was involved in the construction business and looking to exchange business checks.   FENG explained that this customer was concerned about writing checks to Wonderful Electronics because it might arouse suspicion because they companies were not "related" or in the same business.   Instead, FENG suggested that the party was willing to write the checks to Best Offer (FENG: "Yeah...this is the only one as it is under my name. Other are not related to their business, if it's like construction company or something they will write it. For electronics they will not write it for non-related business reasons.").   I therefore believe ZHANG and FENG knowingly use their various bank accounts to further their money transmitting business.

161.    Based on the above, I believe ZHANG, FENG, and the Target Subjects use the Best Offer account to facilitate money transmitting and/or money laundering activities.

## TARGET LOCATIONS

### Target Location 1: 23 Tyler Street, Second Floor, Boston, Massachusetts

162.     As set forth above, China Gourmet restaurant and the office space above it are located at 23 Tyler Street in Boston and are owned and operated by ZENG and ZHANG.  On certain China Gourmet bank accounts, ZENG lists the business address as 23 Tyler Street, Second Floor (Target Location 1).  ZENG also listed Target Location 1 as the address on bank accounts for two other businesses she owns: 11-17 Newbury Street Realty LLC, and Choo Choo Train Inc, dba Food Wall Restaurant (a restaurant in Jamaica Plain).  FENG's shell company, Best Offer trading, is also registered to Target Location 1 specifically.  Based on all of this, I believe the financial and business operations for China Gourmet and the Target Subjects' other companies is based inside Target Location 1.

163.     As detailed above, ZENG, ZHANG, QIU FANG, WEI QING, XIAN RONG, and LIU all helped to facilitate numerous money laundering transactions and to conduct unlicensed money transmitting business at 23 Tyler Street.  Based on surveillance alone, however, investigators were often unable to determine—from physical surveillance alone—whether the funds entered the China Gourmet restaurant on the first floor, or Target Location 1 on the second floor.  Based on the recent undercover money transactions with ZHANG, however, it is clear that the money laundering and money transmitting business is centralized from within Target Location 1 on the second floor.  As detailed above, ZHANG led UC directly to an office room within Target Location 1 for both transactions, and ZHANG and QIU FANG retrieved the bulk cash and money counter from an adjoining room, also within Target Location 1.  Based on these transactions, I believe the Target Subjects store drug proceeds, proceeds from their money transmitting business, and other facilitating property and evidence of the Target Offenses within Target Location 1.

164.     In addition to the undercover transactions, the Target Subjects routinely referred to transactions taking place "upstairs," which I believe referred to Target Location 1, which is literally upstairs from the China Gourmet restaurant space.

165.     For example, on February 11, 2022, ZENG called QIU FANG Phone and asked her sister, "Boss Wang has 6,000 plus left, if he comes over for the money will we have it?"  QIU FANG responded, "I don't know, I have to go upstairs and check."  On February 21, 2022, ZHANG called QIU FANG Phone and asked, "How much money did Zheng Hei give?"  QIU FANG responded, "I don't know. Let me go upstairs and check for you."  ZHANG admonished, "You can go check it, but do not touch it.  I need to use that money."  And, on March 7, 2022, ZENG called QIU FANG Phone and asked QIU FANG to gather money, to which QIU FANG responded that "upstairs [she has] one stack plus another stack that's two thousand."

166.     The Target Subjects also referred to specific locations within Target Location 1 where they stored the cash.  For example, on March 4, 2022, ZENG called China Gourmet Phone and spoke with a female believed (based on her voice) to be QIU FANG.  ZENG directed QIU FANG to go "upstairs" to get a deposit slip from the safe.   Based on this call, I believe the Target Subjects maintain a safe inside Target Location 1 in which they store fruits, instrumentalities, and evidence of the Target Offenses.

167.     Additionally, on November 22, 2021, at approximately 12:40 p.m., ZENG called QIU FANG Phone and asked QIU FANG to gather bulk currency for a third party to pick up:  "On my side I have some large ones, then you gather it all together.  Do your best to give all big bills….Put it nicely in a paper bag. Package it nicely….Package it well….You go gather it, I have it upstairs."  I believe ZENG was instructing QIU FANG to retrieve a large amount of bulk currency from Target Location 1 ("upstairs" from the China Gourmet restaurant) and to package the currency using large denominations of currency to give to a third party. Two days later, on

November 24, 2021, at approximately 11:43 a.m., ZENG received an incoming call on TT3 from

QIU FANG Phone:

> QIU FANG: It's fifty. Your money that is in the cabinet upstairs. I'm going to gather them together. After I gather it all total. It's still eight hundred missing.
>
> ZENG: Yi Juan's side has it.
>
> QIU FANG: She only give four thousand.
>
> ZENG: It's four thousand. Auntie [UI], she haven't come down to get the stuff. It's all at, it's all at behind the...
>
> QIU FANG: Behind where?
>
> ZENG: It's behind the door.
>
> QIU FANG: Is it sister who put it somewhere?
>
> ZENG: It's the door, hanging on the door. It's hanging behind the door, in that small room.
>
> QIU FANG: Oh, let me take a look. Yes, yes, yes. I didn't know...
>
> ZENG: Uhm.
>
> QIU FANG: I even went to look in the refrigerator.
>
> ZENG: Take that stack first, that stack first then calculate it.
>
> QIU FANG: I didn't know, how do I know that it's hanging behind the door. I see it now.
>
> ZENG: You can take that first, chef.
>
> QIU FANG: I know.
>
> ZENG: In a little while I will transfer another one to you. It's few hundred dollars you can go in to buy it. Also give it to Youyo to writing it. Huh?
>
> QIU FANG: You are asking Youyo, there another thing...
>
> ZENG: [Voices overlap] For Lao Ge, give him four thousand.
>
> QIU FANG: For Lao Ge, you are asking me to bring over four thousand to right?
>
> ZENG: No, for Lao Ge he will come to get it.
>
> QIU FANG: For Lao Ge, he will come get it himself right? You are asking me to give four thousand to Lao Ge. You got it….

168.    I believe ZENG was again instructing QIU FANG to gather bulk currency stored within Target Location 1 to deliver to third parties.  I believe the money may have been hidden or otherwise secreted away ("In the cabinet," "It's behind the door," "I even went to look in the refrigerator.").

169.    Based on the investigation, including all of the above, I believe fruits, instrumentalities, and evidence of the Target Offenses—including bulk cash, checks, receipts,

deposit slips, and other financial records, as detailed in Attachment B1—will be located within Target Location 1, as described in Attachment A1.

**Target Location 2: 117 Standish Avenue, Quincy, Massachusetts**

170.     Based on a public records search, FENG is an officer of the Chinese Consolidated Benevolent Association of New England, Inc.  In the corporate filings for this organization, FENG listed his address at Target Location 2.

171.     According to bank records obtained by investigators, FENG also listed Target Location 2 as his residential address on several of his bank accounts, including an account opened in August 2020, as well accounts which remain active as recently as May 2022 (the most recent records obtained from the bank).  Based on this, investigators believe Target Location 2 is FENG's long term and current residence.

172.     On June 15 and 16, 2022, investigators observed two of FENG's vehicles parked at Target Location 2: (1) a grey Maserati SUV bearing Massachusetts registration VT45866, which is registered to FENG at Target Location 2; and (2) a black Ford F-150 bearing Massachusetts registration VT46799, also registered to FENG at Target Location 2.

173.     Investigators have repeatedly and recently seen FENG entering and exiting Target Location 2, including as recently as June 21, 2022, and several times in the week prior to June 21, 2022.

174.     As discussed above, FENG used FENG Phone throughout the investigation in furtherance of the Target Offenses.  According to call records detailed in the previous section FENG Phone remains active and in contact with TT2, TT3, and TT4.

175.     Based on the above, I believe Target Location 2 is FENG's primary residence, and that fruits, instrumentalities, and evidence of the Target Offenses, at set forth in Attachment B2—

including FENG Phone, and records indicating ownership and control over the phone—will be found within Target Location 2, as described in Attachment B2.

**Target Location 3: 24 Merrymount Avenue, Quincy, Massachusetts.**

176.    Throughout the investigation, investigators have observed WEI QING operate a 2014 gray Toyota Sienna bearing Massachusetts registration 1VG755 with VIN 5TDDK3DC8ES078970, which is registered to WEI QING at Target Location 3.  On March 3, 2022, investigators installed a court-authorized GPS tracking device on WEI QING's Toyota while it was parked on the street near Target Location 3.  As detailed above, WEI QING left directly from Target Location 3 to drive to New York and was stopped while he was driving back to Boston while transporting over $250,000 in bulk cash suspected drug proceeds.

177.    WEI QING Phone is subscribed to WEI QING at Target Location 3, and WEI QING's driver's license lists Target Location 3 as his residence.

178.    On June 15, 2022, investigators observed WEI QING driving the Sienna at QIU FANG's residence at Target Location 4.  Investigators attempted to follow WEI QING but lost sight of him briefly.  Investigators traveled directly to Target Location 3, where they observed the Sienna WEI QING had been driving now parked back at Target Location 3.  As such, investigators believe WEI QING drove from his sister QIU FANG's residence (Target Location 4) directly back to his own residence (Target Location 3), all in a vehicle registered in his name, at Target Location 3.

179.    On this same date, investigators observed another vehicle, also registered to WEI QING at Target Location 3, parked outside Target Location 3.

180.    As discussed above, WEI QING regularly used WEI QING Phone in furtherance of the Target Offenses.  According to call records for WEI QING Phone between May 1 and May

31, 2022, this device was in contact with QIU FANG Phone approximately 36 times, ZENG's TT3 17 times, and ZENG's TT2 3 times. As such, I believe WEI QING Phone remains active.

181. Based on the above, I believe Target Location 3 is WEI QING's primary residence, and that fruits, instrumentalities, and evidence of the Target Offenses, at set forth in Attachment B3—including any new cellular devices used by WEI QING, and records indicating ownership and control over the phone—will be found within Target Location 3, as described in Attachment B3.

### Target Location 4: 34 Sewall Street, Quincy, Massachusetts

182. According to public records, ZENG and XIAN RONG purchased Target Location 4 more than 20 years ago. Investigators believe the property was transferred to QIU FANG and "Xiang Chen"—believed to be related to QIU FANG— at some point, because these two individuals obtained a mortgage for the property in June 2014.

183. As noted above, the registered owners and directors of China Gourmet are ZHANG, ZENG, and XIAN RONG. While the business itself it registered at 23 Tyler Street, each of these three Target Subjects lists Target Location 4 as their address in corporate filings, including as recently as March 12, 2022, when ZENG filed the 2021 Annual Report for China Gourmet.

184. On February 10, 2022, at approximately 3:12 p.m., ZENG called QIU FANG and discussed the pick-up of "four units," which is believed to mean $40,000. At the end of the call, QIU FANG agreed to give ZENG the money, and ZENG stated that she would text QIU FANG when she arrives so that QIU FANG can come down with the money. At approximately 3:44 p.m., the court-authorized GPS tracking device affixed to ZENG's vehicle indicated that it arrived at Target Location 4. Based on the above, I believe that ZENG retrieved $40,000 in cash from QIU FANG, at Target Location 4, in furtherance of the Target Offenses. I further believe that, like

ZENG, QIU FANG also stores and/or processes cash and currency at her residence, all in furtherance of the Target Offenses.

185.  QIU FANG's driver's license lists Target Location 4 as her residence.

186.  On June 15, 2022, investigators observed two vehicles registered to QIU FANG's relative parked at Target Location 4: (1) a grey Kia Carnival bearing Massachusetts registration 4HSH49, registered to QIU FANG's relative Xiang CHEN at Target Location 4, and (2) a purple/plum Mercedes crossover, bearing Massachusetts registration 5YGV50, also registered to Xiang CHEN at Target Location 4.  During the course of the investigation, investigators have observed QIU FANG driving this purple Mercedes.

187.  Also on June 15, 2022, investigators observed WEI QING—QIU FANG's brother—driving at Target Location 4.  As noted above, WEI QING drove from Target Location 4 back to his own residence.  I believe this is consistent with WEI QING visiting his sister, QIU FANG, at her home at Target Location 4.

188.  QIU FANG Phone is subscribed to Target Location 4 (in a family member's name).

189.  As detailed above, QIU FANG used QIU FANG Phone in furtherance of the Target Offenses.  According to call records, QIU FANG Phone remains active and in contact with the Target Subjects.  For example, between May 1 and June 1, 2022, QIU FANG Phone contacted ZENG's TT3 approximately 51 times and ZENG's TT2 41 times, XIAN RONG Phone 34 times, WEI QING's suspected new 8870 number 36 times, and ZHANG's TT4 11 times.

190.  Based on the above, I believe Target Location 4 is QUI FANG's primary residence and that fruits, instrumentalities, and evidence of the Target Offenses, at set forth in Attachment B4—including QUI FANG Phone, and records indicating ownership and control over the phone—will be found within Target Location 4, as described in Attachment B4.

**Target Location 5: 147 Summer Street, Hanover, Massachusetts**

191.     When investigators searched LIU's TT1 they located WeChat messages between LIU and ZENG from November 27, 2021, in which they discussed a money laundering transaction for a suspected $100,000.  In the messages, LIU provided a Chinese bank account number and ZENG provided the address for Target Location 5.  I believe LIU provided the bank account number into which ZENG could wire the funds, and that ZENG provided the address of Target Location 5 for LIU to deliver the bulk cash drug proceeds.  As such, I believe the Target Subjects use Target Location 5 to store and/or process drug proceeds in furtherance of the Target Offenses.

192.     According to public records, ZENG and ZHANG purchased Target Location 5 in April 2016.  XIAN RONG, however, lists Target Location 5 as his home address according to banking records for accounts XIAN RONG has held since 2019 and through at least April 2021 (the last date for which bank account records have been requested).

193.     Throughout the investigation, investigators have observed XIAN RONG driving two primary vehicles: A 2020 white Mercedes Benz GLE350 bearing Massachusetts registration 812TA7, registered to "Xiurong You" at Target Location 5, and a silver Toyota Sienna bearing Massachusetts registration 8PL591, registered to XIAN RONG at Target Location 5.

194.     On June 15 and 16, 2022, investigators observed XIAN RONG's Sienna parked outside of Target Location 5.  On these same dates, investigators also observed a blue Mercedes SUV bearing Massachusetts registration 7MB266, registered to ZHANG; and a BMW x7 bearing Massachusetts registration MA 1FRJ29, registered to ZENG, parked outside of Target Location 5.  I believe this is consistent with ZHANG and/or ZENG visiting their brother/brother-in-law, XIAN RONG, at Target Location 5.

195.     Additionally, investigators have observed XIAN RONG himself at Target Location 5, including as recently as June 20, 2022.

196.     As detailed above, XIAN RONG used XIAN RONG Phone in furtherance of the Target Offenses. According to call records, XIAN RONG Phone remains active and in contact with the Target Subjects.  For example, between May 1 and June 1, 2022, XIAN RONG Phone contacted ZENG's TT3 approximately 79 times, QIU FANG Phone 34 times, ZENG's TT2 14 times, and ZHANG's TT4 10 times.

197.     Based on the above, I believe Target Location 5 is XIAN RONG's primary residence.  I therefore believe that fruits, instrumentalities, and evidence of the Target Offenses, at set forth in Attachment B5—including XIAN RONG Phone, and records indicating ownership and control over the phone—will be found within Target Location 5, as described in Attachment B5.

### MONEY LAUNDERERS' AND MONEY TRANSMITTERS' USE OF RESIDENCES, BUSINESS LOCATIONS, AND CELLULAR TELEPHONES

198.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of money launderers and/or money transmitters, it is generally a common practice for such individuals to maintain in their residences records relating to their activities.  Because money laundering and money transmitting necessary involved financial transactions—and often deliberately involve convoluted transactions structures to obscure their illegal activities—record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Additionally, money launderers and/or money transmitters often maintain telephone and address listings of clients and coconspirators and keep them immediately available in order to efficiently conduct their money laundering and/or money transmitting business.  I am also aware that money launderers and/or money transmitters often

maintain such documents related to their money laundering and money transmitting activities at their residences for an extended period of time, regardless of whether they are physically in possession of illicit proceeds on the premises.

199.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of money launderers and/or money transmitters, it is generally a common practice for money launderers and money transmitters to hide proceeds of their illegal activities, including large amounts of currency and other financial instruments, in secure locations within their residences and other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement.

200.    Even when money launderers and/or money transmitters store their money outside their residence at stash locations or businesses, I know that they often will keep records relating to these offsite storage locations at their residence. Such documents include rental or storage property agreements and receipts.

201.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for money launderers and/or money transmitters to conceal at their residences monies to be laundered and/or transmitted, or records of the same. Here, ZENG and QIU FENG have both stored and/or processed large quantities of bulk cash within their homes, in furtherance of their money laundering and money transmitting activities. Additionally, money launderers and/or money transmitters typically make use of wire transfers, cashier's checks, and money orders to move and transfer money. Indeed, here, ZENG, ZHANG, QIU FANG, FENG and others have been intercepted talking to their co-conspirators about wire transfers and the movement of money through accounts. Based on my training and experience, evidence of such financial transactions

and records relating to income and expenditures of money and wealth in connection with money laundering and/or money transmitting are often kept in the residences of the money launderers and/or money transmitters.

202. Moreover, money launderers and/or money transmitters commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking and money laundering activities, and many of these cellular telephones are kept at their residences. In this investigation, several of the Target Subjects have used multiple telephones, including ZENG. All of the Target Subjects are believed to utilize at least one mobile telephone in furtherance of the Target Offenses. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by money launderers and/or money transmitters in their vehicles, residences, stash locations, and businesses. Money launderers and/or money transmitters often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for money launderers and/or money transmitters to stop using cellular telephones frequently, it is far less common for money launderers and/or money transmitters to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during money-based search warrants that have included cell phones that were no longer being used by a particular target but had nevertheless been retained.

203. When money launderers and/or money transmitters attempt to conceal their activities from discovery by law enforcement, they often place assets, such as bank accounts, vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the money launderers and/or money transmitters.

204.     During the course of residential and storage location searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the offenses under investigation.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, I have learned from this and other investigations that records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.

205.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B1-B5 on their cellular telephones.  As discussed above, the Target Subjects have used or are believed to use cellular telephones in furtherance of their money laundering and/or money transmitting business. As such, I believe evidence of the Target Offenses will be found on the cellular telephones used and/or possessed by the Target Subjects and will be found in the Target Locations.  I also believe that similar records can be stored on laptops, desktops, and other computer devices and I further believe that evidence of the Target Offenses will also be found on the computers used and/or possessed by the Target Subjects and will be found within the Target Locations.

206. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

207. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only

overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

208.    Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in the Target Offenses and that evidence, fruits, and instrumentalities of the Target Offenses will be found inside the Target Locations and on cellular telephones seized therefrom.

## UNLOCKING DEVICES USING BIOMETRIC FEATURES

209.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

210.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch

ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

211. The passcodes that would unlock the Apple devices found during the search of the Target Locations are not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the Apple device(s) found during the search of the Target Locations to the devices' fingerprint sensors or to hold the devices up to the face of the owner(s) in an attempt to unlock the devices for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by these warrants.

212. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

213. Based on the investigation to date, I know that many of the Target Subjects use Apple iPhones as their primary cellular devices. For these reasons, I request that the Court

authorize law enforcement to press the fingers (including thumbs) of individuals found at each Target Location to the sensor of the devices found at each respective Target Location, or place such devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## CONCLUSION

214.     Based on the foregoing, I believe there is probable cause to believe that the Target Locations and cellular telephones and other electronic devices recovered therefrom presently contain the items set forth in Attachments B1-B5 hereto, which are incorporated herein by reference, and that those items constitute evidence of the commission of the Target Offenses, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of money laundering and/or money laundering conspiracy, in violation of 18 U.S.C. § 1956 and/or 1957, and/or conducting unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.  Accordingly, I respectfully request the Court issue search warrants for the Target Locations.

Brady O'Donnell
Special Agent
Drug Enforcement Administration

**Jun 22, 2022**

Sworn via telephone in according with Fed. R. Crim. P 4.1 on this _____ day of June, 2022.

JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A1**
(Location to be Searched)

   **Target Location 1** is the second floor of the building at 23 Tyler Street.  The building at 23 Tyler Street is a multi-colored brick, multi-floor mixed use building in a busy section of Boston's Chinatown located next to a parking lot. The location to be searched is Floor 2, an office space immediately above the China Gourmet Restaurant, which is located at 23 Tyler Street, Floor 1.  The door to Target Location 1 is a frosted glass with a door handle that is passcode controlled. Photographs of Target Location 1 can be found below.  Target Location 1 is accessed via an external set of stairs which leads to a landing with an entrance door to the China Gourmet Restaurant on the left, and a glass door straight ahead.  After proceeding through this glass door straight ahead, and through a second glass door, Target Location 1 is accessed via a second set of internal stairs, which leads to a landing.  The frosted glass entrance door to Target Location 1 has a red-colored door frame and is the only door on this second floor landing. The area to be searched is the entire second floor accessible via this frosted glass door.



**ATTACHMENT B1**
(Items to be Seized)

All records from January 1, 2021, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations 18 U.S.C. § 1956 and/or 1957 (money laundering and/or money laundering conspiracy); and 18 U.S.C. § 1960 (conducting unlicensed money transmitting business)(collectively, the "Target Offenses"), including:

1. Books, records, receipts, notes, ledgers, and other papers relating to the laundering of drug and other illicit proceeds and/or money transmitting, including records of transactions, log books, ledgers, personal telephone/address books containing the names of money laundering and/or money transmitting customers and/or coconspirators, electronic organizers, bills, receipts, and bank and financial records.

2. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their primary office spaces, such as mail, utility and telephone bills, bank statements, credit card receipts, licenses, incorporation documents, and keys.

3. Cash, currency, and records relating to financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances, theft, fraud, or other unlawful activities. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; bank records; money orders; checks; and gift cards.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank or financial accounts, safes, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Documents or tangible evidence reflecting specified unlawful activity from which the laundered proceeds and/or transmitted funds were derived, including evidence of narcotics trafficking, stolen and/or fraudulently-obtained gift cards, and/or Apple devices.

6. Photographs, videos, or other records concerning money laundering, money transmitting, or identities of coconspirators.

7. Cellular telephones and/or computers in the possession of or used by Shi Rong ZHANG, Qiu Mei ZENG, Vincent FENG, QIU FANG Zeng, Cheng LIU, WEI QING Zeng, and XIAN RONG Zeng (the "Target Subjects") (including but not limited to telephone numbers 781-267-4098 (TT4), 857-452-2829 (TT2), 857-250-5197 (TT3), 617-659-7117 (FENG Phone), 646-250-2557 (QIU FANG Phone), 646-964-8870 (WEI QING suspected new phone), and/or 646-789-2989 (XIAN RONG Phone)), and all names, words, telephone

numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity, located in the memory of any mobile telephone and/or computer, including but not limited to:

a.  Names and contact information that have been programmed into the Devices (including but not limited to contacts lists) of individuals who may be engaged in money laundering and/or money transmitting;

b.  Logs of calls and messages (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the Devices;

c.  Text messages both sent to and received from the Devices (including any in draft form) relating to or referencing money laundering and/or referencing individuals engaged in money laundering;

d.  Information involving the travel to conduct money laundering transactions and/or the transportation of illicit proceeds and property derived from and/or representing illicit proceeds and/or to engage in money transmitting business;

e.  Incoming and outgoing voice mail messages both to and from the Devices relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

f.  GPS data;

g.  Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

h.  Messages and/or other communications via messaging applications (e.g., WhatsApp, Snapchat, WeChat, Signal, Telegram) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

i.  Documents, photographs, or videos in any format, relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

j.  Records and data relating to or referencing the payment, receipt, transfer, or storage of money or other things of value, including but not limited to bank records, gift cards and e-gift cards, Apple Pay, and other electronic wallets;

k.     All data within the Devices evidencing ownership, possession, custody, control, or use of the device; and

l.     Service Provider handset unlock password(s) and any other passwords used to access the Devices and the electronic data described above.

During the search described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of each of the Target Subjects to the fingerprint sensor of any Devices found inside Target Location and/or use the camera of the Devices to scan the face of the Target Subjects for the purpose of attempting to unlock the Devices in order to search the contents as authorized by this warrant.

**ATTACHMENT A2**
(Location to be Searched)

**Target Location 2: 117 Standish Avenue, Unit 2, Quincy, Massachusetts.** The residence at 117 Standish Avenue is a grey-colored, vinyl-sided, multi-unit house with a small driveway to the left of the residence that leads to a parking area in the rear. There are multiple entrances to the building, however the location to be searched is Unit 2, which can be accessed through this side door circled in red below. A photograph of Target Location 2 can be found below.



# ATTACHMENT B2
(Items to be Seized)

All records from January 1, 2021, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations 18 U.S.C. § 1956 and/or 1957 (money laundering and/or money laundering conspiracy); and 18 U.S.C. § 1960 (conducting unlicensed money transmitting business)(collectively, the "Target Offenses"), including:

1. Books, records, receipts, notes, ledgers, and other papers relating to the laundering of drug and other illicit proceeds and/or money transmitting, including records of transactions, log books, ledgers, personal telephone/address books containing the names of money laundering and/or money transmitting customers and/or coconspirators, electronic organizers, bills, receipts, and bank and financial records.

2. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as mail, utility and telephone bills, bank statements, credit card receipts, and keys.

3. Cash, currency, and records relating to financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances, theft, fraud, or other unlawful activities. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; bank records; money orders; checks; and gift cards.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank or financial accounts, safes, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Documents or tangible evidence reflecting specified unlawful activity from which the laundered proceeds and/or transmitted funds were derived or facilitating property, including evidence of narcotics trafficking, stolen and/or fraudulently-obtained gift cards, and/or Apple devices.

6. Photographs, videos, or other records concerning money laundering, money transmitting, or identities of coconspirators.

7. Cellular telephones in the possession of or used by Vincent FENG (including but not limited to 617-659-7117 (FENG Phone), and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity, located in the memory of any mobile telephone, including but not limited to:

a. Names and contact information that have been programmed into the Devices (including but not limited to contacts lists) of individuals who may be engaged in money laundering;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the Devices;

c. Text messages both sent to and received from the Devices (including any in draft form) relating to or referencing money laundering and/or referencing individuals engaged in money laundering;

d. Information involving the travel to conduct money laundering transactions and/or the transportation of illicit proceeds and property derived from and/or representing illicit proceeds and/or to engage in money transmitting business;

e. Incoming and outgoing voice mail messages both to and from the Devices relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

f. GPS data;

g. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

h. Messages and/or other communications via messaging applications (e.g., WhatsApp, Snapchat, WeChat, Signal, Telegram) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

i. Documents, photographs, or videos in any format, relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

j. Records and data relating to or referencing the payment, receipt, transfer, or storage of money or other things of value, including but not limited to bank records, gift cards and e-gift cards, Apple Pay, and other electronic wallets;

k. All data within the Devices evidencing ownership, possession, custody, control, or use of the device; and

l. Service Provider handset unlock password(s) and any other passwords used to access the Devices and the electronic data described above.

During the search described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of Vincent FENG to the fingerprint sensor of any Devices found inside Target Location and/or use the camera of the Devices to scan the face of Vincent FENG for the purpose of attempting to unlock the Devices in order to search the contents as authorized by this warrant.

     **Target Location 3: 24 Merrymount Ave, Quincy, Massachusetts.** The building at 24 Merrymount Ave is a single family residence with white vinyl siding. There are multiple entrances to the building, however, the main entrance to the residence is in the front of the building, at the top of a small set of stairs. The location to be searched is the entire residence. A photograph of Target Location 3 can be found below.



# ATTACHMENT B3
## (Items to be Seized)

All records from January 1, 2021, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations 18 U.S.C. § 1956 and/or 1957 (money laundering and/or money laundering conspiracy); and 18 U.S.C. § 1960 (conducting unlicensed money transmitting business)(collectively, the "Target Offenses"), including:

1. Books, records, receipts, notes, ledgers, and other papers relating to the laundering of drug and other illicit proceeds and/or money transmitting, including records of transactions, log books, ledgers, personal telephone/address books containing the names of money laundering and/or money transmitting customers and/or coconspirators, electronic organizers, bills, receipts, and bank and financial records.

2. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as mail, utility and telephone bills, bank statements, credit card receipts, and keys.

3. Cash, currency, and records relating to financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances, theft, fraud, or other unlawful activities. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; bank records; money orders; checks; and gift cards.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank or financial accounts, safes, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Documents or tangible evidence reflecting specified unlawful activity from which the laundered proceeds and/or transmitted funds were derived, including evidence of narcotics trafficking, stolen and/or fraudulently-obtained gift cards, and/or Apple devices.

6. Photographs, videos, or other records concerning money laundering, money transmitting, or identities of coconspirators.

7. Cellular telephones in the possession of or used by WEI QING Zeng (including but not limited to 646-964-8870), and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity, located in the memory of any mobile telephone, including but not limited to:

a.    Names and contact information that have been programmed into the Devices (including but not limited to contacts lists) of individuals who may be engaged in money laundering;

b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the Devices;

c.    Text messages both sent to and received from the Devices (including any in draft form) relating to or referencing money laundering and/or referencing individuals engaged in money laundering;

d.    Information involving the travel to conduct money laundering transactions and/or the transportation of illicit proceeds and property derived from and/or representing illicit proceeds and/or to engage in money transmitting business;

e.    Incoming and outgoing voice mail messages both to and from the Devices relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

f.    GPS data;

g.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

h.    Messages and/or other communications via messaging applications (e.g., WhatsApp, Snapchat, WeChat, Signal, Telegram) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

i.    Documents, photographs, or videos in any format, relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

j.    Records and data relating to or referencing the payment, receipt, transfer, or storage of money or other things of value, including but not limited to bank records, gift cards and e-gift cards, Apple Pay, and other electronic wallets;

k.    All data within the Devices evidencing ownership, possession, custody, control, or use of the device; and

l.    Service Provider handset unlock password(s) and any other passwords used to access the Devices and the electronic data described above.

During the search described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of WEI QING Zeng to the fingerprint sensor of any Devices found inside Target Location and/or use the camera of the Devices to scan the face of WEI QING Zeng for the purpose of attempting to unlock the Devices in order to search the contents as authorized by this warrant.

**ATTACHMENT A4**
(Location to be Searched)

**Target Location 4: 34 Sewall Street, Quincy, Massachusetts.** The building at 34 Sewall Street is a yellow residence with a detached garage in the rear. The location to be searched is the entire residence. A photograph of Target Location 4 can be found below.



**ATTACHMENT B4**
(Items to be Seized)

All records from January 1, 2021, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations 18 U.S.C. § 1956 and/or 1957 (money laundering and/or money laundering conspiracy); and 18 U.S.C. § 1960 (conducting unlicensed money transmitting business)(collectively, the "Target Offenses"), including:

1. Books, records, receipts, notes, ledgers, and other papers relating to the laundering of drug and other illicit proceeds and/or money transmitting, including records of transactions, log books, ledgers, personal telephone/address books containing the names of money laundering and/or money transmitting customers and/or coconspirators, electronic organizers, bills, receipts, and bank and financial records.

2. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as mail, utility and telephone bills, bank statements, credit card receipts, and keys.

3. Cash, currency, and records relating to financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances, theft, fraud, or other unlawful activities. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; bank records; money orders; checks; and gift cards.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank or financial accounts, safes, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Documents or tangible evidence reflecting specified unlawful activity from which the laundered proceeds and/or transmitted funds were derived, including evidence of narcotics trafficking, stolen and/or fraudulently-obtained gift cards, and/or Apple devices.

6. Photographs, videos, or other records concerning money laundering, money transmitting, or identities of coconspirators.

7. Cellular telephones in the possession of or used by QIU FANG Zeng (including but not limited to 646-250-2557 (QIU FANG Phone)), and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity, located in the memory of any mobile telephone, including but not limited to:

a. Names and contact information that have been programmed into the Devices (including but not limited to contacts lists) of individuals who may be engaged in money laundering;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the Devices;

c. Text messages both sent to and received from the Devices (including any in draft form) relating to or referencing money laundering and/or referencing individuals engaged in money laundering;

d. Information involving the travel to conduct money laundering transactions and/or the transportation of illicit proceeds and property derived from and/or representing illicit proceeds and/or to engage in money transmitting business;

e. Incoming and outgoing voice mail messages both to and from the Devices relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

f. GPS data;

g. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

h. Messages and/or other communications via messaging applications (e.g., WhatsApp, Snapchat, WeChat, Signal, Telegram) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

i. Documents, photographs, or videos in any format, relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

j. Records and data relating to or referencing the payment, receipt, transfer, or storage of money or other things of value, including but not limited to bank records, gift cards and e-gift cards, Apple Pay, and other electronic wallets;

k. All data within the Devices evidencing ownership, possession, custody, control, or use of the device; and

l. Service Provider handset unlock password(s) and any other passwords used to access the Devices and the electronic data described above.

During the search described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of QIU FENG Zeng to the fingerprint sensor of any Devices found inside Target Location and/or use the camera of the Devices to scan the face of QIU FANG Zeng for the purpose of attempting to unlock the Devices in order to search the contents as authorized by this warrant.

**Target Location 5: 147 Summer Street, Hanover, Massachusetts.** The building at 147 Summer Street is a beige single-family residence, with a long driveway that leads to a two-car garage on the right side of the residence. The location to be searched is the entire residence. Target Location 5 can be accessed via the front door. A photograph of Target Location 5 can be found below.



All records from January 1, 2021, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations 18 U.S.C. § 1956 and/or 1957 (money laundering and/or money laundering conspiracy); and 18 U.S.C. § 1960 (conducting unlicensed money transmitting business)(collectively, the "Target Offenses"), including:

1. Books, records, receipts, notes, ledgers, and other papers relating to the laundering of drug and other illicit proceeds and/or money transmitting, including records of transactions, log books, ledgers, personal telephone/address books containing the names of money laundering and/or money transmitting customers and/or coconspirators, electronic organizers, bills, receipts, and bank and financial records.

2. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as mail, utility and telephone bills, bank statements, credit card receipts, and keys.

3. Cash, currency, and records relating to financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances, theft, fraud, or other unlawful activities. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; bank records; money orders; checks; and gift cards.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank or financial accounts, safes, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Documents or tangible evidence reflecting specified unlawful activity from which the laundered proceeds and/or transmitted funds were derived, including evidence of narcotics trafficking, stolen and/or fraudulently-obtained gift cards, and/or Apple devices.

6. Photographs, videos, or other records concerning money laundering, money transmitting, or identities of coconspirators.

7. Cellular telephones in the possession of or used by XIAN RONG Zeng (including but not limited to telephone number 646-789-2989 (XIAN RONG Phone)), and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity, located in the memory of any mobile telephone, including but not limited to:

a. Names and contact information that have been programmed into the Devices (including but not limited to contacts lists) of individuals who may be engaged in money laundering;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the Devices;

c. Text messages both sent to and received from the Devices (including any in draft form) relating to or referencing money laundering and/or referencing individuals engaged in money laundering;

d. Information involving the travel to conduct money laundering transactions and/or the transportation of illicit proceeds and property derived from and/or representing illicit proceeds and/or to engage in money transmitting business;

e. Incoming and outgoing voice mail messages both to and from the Devices relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

f. GPS data;

g. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

h. Messages and/or other communications via messaging applications (e.g., WhatsApp, Snapchat, WeChat, Signal, Telegram) both to and from the Devices (including any in draft form) relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

i. Documents, photographs, or videos in any format, relating to or referencing money laundering and/or money transmitting or individuals engaged in such activity;

j. Records and data relating to or referencing the payment, receipt, transfer, or storage of money or other things of value, including but not limited to bank records, gift cards and e-gift cards, Apple Pay, and other electronic wallets;

k. All data within the Devices evidencing ownership, possession, custody, control, or use of the device; and

l. Service Provider handset unlock password(s) and any other passwords used to access the Devices and the electronic data described above.

During the search described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of XIAN RONG Zeng to the fingerprint sensor of any Devices found inside Target Location and/or use the camera of the Devices to scan the face of XIAN RONG Zeng for the purpose of attempting to unlock the Devices in order to search the contents as authorized by this warrant.